**2013-1499**
**(Interference No. 105,866)**

# United States Court of Appeals
# for the Federal Circuit

EDWARD TOBINICK,

*Appellant,*

*v.*

KJELL OLMARKER and BJORN RYDEVIK,

*Appellees.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board.*

## BRIEF OF APPELLANT

ROBERT HAHL
RICHARD A. NEIFELD, PH.D.
NEIFELD IP LAW, PC
4813-B Eisenhower Avenue
Alexandria, VA 22304
(703) 415-0012

*Counsel for Appellant*

SEPTEMBER 3, 2013

# <u>CERTIFICATE OF INTEREST</u>

Counsel for the Appellant, Edward Lewis Tobinick, M.D.,  certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

        Edward Lewis Tobinick, M.D.

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

        TACT IP LLC

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

        none

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

        ROBERT HAHL
        RICHARD A. NEIFELD, PH.D.
        NEIFELD IP LAW, PC

September 3, 2013                                        /s/ Robert Hahl
                                                        Counsel for Appellant

# TABLE OF CONTENTS

*Page*

CERTIFICATE OF INTEREST ............................................................................. i

TABLE OF AUTHORITIES ............................................................................ iii

STATEMENT OF RELATED CASES .................................................................v

JURISDICTIONAL STATEMENT ....................................................................1

STATEMENT OF THE ISSUES.........................................................................1

STATEMENT OF THE CASE.............................................................................1

STATEMENT OF THE FACTS .........................................................................2

SUMMARY OF THE ARGUMENT ..................................................................6

    INEQUITABLE CONDUCT SUMMARY......................................................11

ARGUMENT ....................................................................................................14

    STANDARD OF REVIEW .............................................................................14

    THE BOARD'S CLAIM CONSTRUCTION, AND ITS ERRORS ...................16

    INEQUITABLE CONDUCT...........................................................................30

CONCLUSIONS AND STATEMENT OF RELIEF SOUGHT ............................34

ADDENDUM

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

*Page(s)*

## Cases

Agilent Tech., Inc. v. Affymetrix, Inc,
    567 F.3d 1366 (Fed. Cir. 2009).......................................................... 6, 18

Allentown Mack Sales and Service, Inc. v. National Labor Relations Bd.,
    522 U.S. 359 (1998) ............................................................................15

Citizens to Preserve Overton Park v. Volpe,
    401 U.S. 402 (1971) ............................................................................15

DeMariniSports, Inc. v. Worth, Inc.,
    239 F.3d 1314, 57 USPQ2d 1889 (Fed. Cir. 2001) ............................29

Dickinson v. Zurko,
    527 U.S. 150 (1999)...................................................................... *passim*

Hazel-Atlas Glass Co. v. Hartford-Empire Co.,
    322 U.S. 238 (1944) ............................................................................33

In re Elsner,
    381 F.3d 1 125, 2004 U.S. App. LEXIS 16708,
    72 U.S.P.Q.2D (BNA) 1038 (Fed. Cir. 2004) ............................. 14, 28

In re Gartside,
    203 F.3d 1305, 53 U.S.P.Q.2D 1769 (Fed. Cir. 2000) ................. 14, 15

In re Sang-Su Lee,
    277 F.3d 1338 (Fed. Cir. 2002)...........................................................15

Interactive Gift Express, Inc. v.Compuserve, Inc.,
    256 F.3d 1323, 59 USPQ2d 1401 (Fed. Cir. 2001) ............................29

J.P. Stevens & Co. v. Lex Tex Ltd.,
    747 F.2d 1553 (Fed. Cir. 1984)..................................................... 12, 31

Keystone Driller Co. v. Gen. Excavator Co.,
    290 U.S. 240 (1933) ..................................................................... 13, 33

Liebel-Flarsheim Co. v. Medrad, Inc.,
   358 F.3d 898, 2004 U.S. App. LEXIS 2218,
   69 USPQ2d 1801 (Fed. Cir. 2004) ....................................................26

Markman v. Westview Instruments, Inc.,
   52 F.3d 967, 34 USPQ2d 1321 (Fed. Cir. 1995);
   aff'd 117 S.Ct. 1040, 38USPQ2d 1461 (1996) ...................................28

Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.,
   324 U.S. 806 (1945).........................................................................33

Process Control Corp. v. HydReclaim Corp.,
   190 F.3d 1350, 52USPQ2d 1029 (Fed. Cir. 1999) .............................29

Tegal Corp. v. Tokyo Electron Am., Inc.,
   257 F.3d 1331, 59 USPQ2d 1385 (Fed. Cir. 2001) ............................29

Teleflex, Inc. v. Ficosa N. Am. Corp.,
   299 F.3d 1313, 63 USPQ2d 1374 (Fed. Cir. 2002) ............... 10, 27, 29

Texas Digital Systems,Inc. v. Telegenix, Inc.,
   308 F.3d 1193, 64 USPQ2d 1812 (Fed. Cir. 2002) ............................29

Therasense, Inc. v. Becton, Dickinson & Co.,
   649 F.3d 1276 (Fed. Cir. 2011) (en banc) ................................... 13, 33

Vitronics Corp. v. Conceptronic, Inc.,
   90 F.3d 1576, 39 USPQ2d 1573 (Fed.Cir. 1996) ..............................28

**Statutes**

35 U.S.C. §§141-144.........................................................................1

35 USC §112 ............................................................................ *passim*

5 USC §706 ....................................................................................14

**Regulations**

CFR 1.56(a)............................................................................... 12, 32

MPEP 2001.03 .......................................................................... 12, 32

## <u>STATEMENT OF RELATED CASES</u>

**47.5.(a)** There **are** no appeals in or from the same civil action or proceeding in the lower court or body that was previously before this or any other appellate court

**47.5(b)** There is no case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 35 U.S.C. §141 to 35 U.S.C. §144. The judgment appealed from and entered 22 January 2013 is final. The Decision on Tobinick's Request for Rehearing was entered 01 April 2013. **A33**  Tobinick's Notice of Appeal was filed on May 29, 2013.

## STATEMENT OF THE ISSUES

Whether the Board erred in granting Olmarker's Motion 2, holding that Tobinick's claims 68, 69, and 71 – 80 are unpatentable under 35 USC §112, first paragraph, for lack of written description support.

Whether the Board abused its discretion in dismissing Tobinick's request to file a motion for inequitable conduct.

Whether the Board erred as a matter of law in failing to consider credible allegations of inequitable conduct concerning a patent involved in an ongoing interference.

## STATEMENT OF THE CASE

This is a hard fought patent interference involving 11 motions by appellees (Senior party Olmarker) and 5 motions by appellant (Junior party Tobinick), not counting a detailed request by Tobinick asking permission to file a motion for inequitable conduct which the Board dismissed. The interference ended after the

Board decided just one motion, Olmarker's Motion 2, holding that Tobinick's claims 68, 69, and 71 – 80 (all claims in the application) are unpatentable under 35 USC §112, first paragraph, for lack of written description support. This decision was treated as a threshold issue, involving Tobinick's standing, so none of the other motions were decided. The granting of Olmarker's Motion 2 was based on an erroneous claim construction analysis, which should be reversed so that the Board may resume its work.

## STATEMENT OF THE FACTS

1. The Board found that Tobinick copied claims from Olmarker '995 and '990 patents (**A16**) and therefore looked to Olmarker's specification to construe the claim terms.

2. The Board focused on the specification of the '995 patent, noting that Tobinick did not raise, and the Board did not find, conflicting disclosures in the '990 patent specification.

3. The Board found that the Olmarker '995 specification used the term "locally" to describe experiments in which the antibody is administered directly to the nucleus pulposus tissue and the nerve root. **A17**

4. To construe the claims, the Board relied on a medical dictionary definition of the term "local" and expert testimony stating that that definition is

2

consistent with usage of the term "local" in the Olmarker specification, **A18, 10-15**

5. In light of this dictionary definition and expert testimony, the Board construed Tobinick's claims (and Olmarker's claims, of course) as being directed to administering TNF-α inhibitor "directly to the site where it is intended to act, that is, to the location where nucleus pulposus is causing the symptoms of the nerve disorder."  **A19, 6-11**

6. The Board recognized that Tobinick's '205 application teaches: "In another preferred embodiment injection of the therapeutic molecule to the anatomic area adjacent to the disc herniation is accomplished by epidural injection." **(A1564, 3-4)**

7. Nevertheless, the Board found that Tobinick's '205 application does not describe administering TNF-α inhibitor directly to the site where it is intended to act, that is, to the location where nucleus pulposus is causing the symptoms of the nerve disorder. That factual determination was error.

8. In construing the claims, the Board imported limitations on the scope of "administered locally" and "administered epidurally" from Olmarker's '995 patent specification into the claims.

9. Instead of invoking the ordinary and customary meaning of "administered locally" and "administered epidurally" the Board construed these terms

narrowly; so that even Tobinick's description of treating a herniated disc by epidural administration adjacent to the site of disc herniation (**A1564, 3-4**) was held to be insufficient as a written description of the claimed methods. That holding was legal error.

10. Two of the five Olmarker patents involved in this interference (6,649,589 and 7,708,995) were also involved in a co-pending interference (105,842) against another party, involving Senior Party Le on its application 10/227,488.

11. Olmarker filed a motion for no interference-in-fact in the 105,842 interference which was granted.

12. In cases involving affirmative egregious misconduct, "but for materiality" need not be proven. An example of affirmative egregious misconduct is filing an unmistakably false affidavit.

13. Tobinick asked to file a motion for inequitable conduct, to prove that Olmarker had relied on expert testimony in the co-pending '842 interference that was contained in an unmistakably false affidavit.

14. At the APJ's order, Tobinick submitted a five page paper outlining its allegations of inequitable conduct. (A**7674-7680**) The request was dismissed "at this time" pending factual determinations by the Board, to be made when

deciding the motions. The Board stated that "inequitable conduct may be revisited." **A7689-7690**

15. Tobinick later renewed its request to file an inequitable conduct motion before the motions were decided, that request was denied. **A11354-11355**

16. In its Decision on Motion, the Board held that it need not consider the issues of inequitable conduct raised in this interference and in interference 105,842 because its Opinion in this case "does not hinge on" [the material fact that was allegedly knowingly misrepresented in the '842 interference] and because "the prior art status of the 'Le '488 application' was not raised in this interference, we do not consider Tobinick's allegations." **A26, 14-23**

17. Tobinick informed Olmarker about this false affidavit issue before the Decision in the '842 interference became final.

18. Olmarker know s that Le application 10/227,488 is material prior art to its involved claims in 6,649,589 and 7,708,995. Olmarker has not responded in any way to the presumption that those claims are *prima facie* anticipated or obvious in view of Le's '488 application, which presumption flows logically from the original declaration of Interference No. 105,842.

19. The Board erred legally and also abused its discretion in not letting Tobinick present the actual evidence of inequitable conduct after Tobinick made a *prima facie* case in its five page paper. A**7674-7680**

5

# SUMMARY OF THE ARGUMENT

Pain associated with herniated discs is often caused by a type of tissue called "nucleus pulposus" which is a source of TNF-α. TNF-α is a macromolecule which causes or mediates pain in nerves. Nucleus pulposus is normally found inside vertebral discs but disc herniation allows it to leak out and irritate nearby nerves by direct physical contact of nucleus pulposus with adjacent regions of the spinal cord. **A6383-6384**

Patent Interference No. 105,866 was requested by Tobinick [TACT IP, LLC, appellant] in application Serial No, 12/714,205, using claims copied from Olmarker patents 7,708,995.

Tobinick's claims 68 and 69 are representative:

> Claim 68:    A method of **treating or alleviating one or more symptoms of a nerve disorder mediated by nucleus pulposus** in a mammal in need of such treatment comprising the step of administering a therapeutically effective amount of a TNF-α inhibitor to the mammal, wherein said TNF-α inhibitor is an antibody that blocks TNF-α activity, wherein **the antibody is administered locally**.

> Claim 69:    The method of claim 68, wherein **the antibody is administered epidurally** to the mammal.

The Board referred to Olmarker's '995 patent specification to construe Tobinick's claims under <u>Agilent Tech., Inc. v. Affymetrix, Inc</u>, 567 F.3d 1366, 1375 (Fed. Cir. 2009); specifically, with regard to the limitations of "the antibody is administered locally" (Tobinick claim 68) and "the antibody is administered

6

epidurally." (Tobinick claim 69). **A16, 20-25; A21, 22 – A22, 10; A23, 5-8.** The

Board held that:

> In light of these definitions and the use of the term "local" in Olmarker's specification, **we construe** Tobinick's claims as being directed to administering TNF-α inhibitor **directly to the site where it is intended to act**, that is, to the location **where the nucleus pulposus is causing the symptoms of the nerve disorder**. The limitation "administered locally" excludes systemic administration away from the site where the TNF-α inhibitor is intended to act.

    **A19, 6-11 (**emphasis added)

The holding "we construe Tobinick's claims as…administering…inhibitor directly

to **the site where it is intended to act**, that is, to the location **where the nucleus**

**pulposus is causing the symptoms** of the nerve disorder," refers to a location on

the dura adjacent to the herniated disc, where nucleus pulposus is causing the

symptoms, and that is exactly where Tobinick said to put the drug. ("In another

preferred embodiment injection of the therapeutic molecule to the anatomic area

adjacent to the disc herniation is accomplished by epidural injection.") **A1564, 3-4**.

Epidural administration places a drug *on* the dural membrane (i.e., *epi*-dural).

**A6393-6395** When epidural injection is performed "adjacent to the disc

herniation," according to Tobinick, the drug necessarily goes to a region of the

dura which is adjacent to the site of disc herniation (i.e., "where the medicine is

intended to act" (per the Board). This anatomical location is indicated by the plain

meaning of Tobinick's words, properly understood, since nucleus pulposus remains near the disc it leaked from. **A6378**

It appears that the Board's confusion arose because Olmarker's '995 patent fails to discuss "administered locally" in association with any method for treating or alleviating symptoms of a nerve or spinal disorder.  The only occurrence of "administered locally" in the Olmarker '995 patent is at col. 27, line 18 (**A3279**), and refers to an antibody being physically applied, locally, in the isolated nucleus pulposus used in the Series-2 pig experiments. The Olmarker '995 patent does not literally describe what is meant by "administered locally" or "administered epidurally."

Olmarker relied on a dictionary definition of "local." (i.e., "Local is defined in the medical arts as restricted or pertaining to one spot or part; not general.") **A3545-3545**  Olmarker's expert Dr. Andersson then relied upon this dictionary definition, and his own understanding of the Series-2 experiments in the '995 patent, to conclude: "Thus,"local" administration means administration directly to the site where the medicine is intended to act. *MF 44; Ex. 1060, p. 57, § VI ¶ 21*." (**A3361**)

The "Series-2" experiments involve an animal model that models a condition in which nucleus pulposus has leaked from a herniated disc and is impinging upon nearby nerve roots. In a patient, the affected nerve roots are

generally adjacent to the site of disc herniation (not at the site of disc herniation, which is the ruptured disc itself) because nucleus pulposus remains near its source disc. **A6403**

Tobinick's '205 application explicitly describes how to treat the same type of nerve disorder modeled by Olmarker's Series-2 experiments, i.e., "In another preferred embodiment injection of the therapeutic molecule to the anatomic area adjacent to the disc herniation is accomplished by epidural injection." **A1564, 3-4**. This statement unambiguously describes treating symptoms of a nerve disorder mediated by nucleus pulposus ("disc herniation") by epidural administration ("injection") of a TNF-α binding antibody ("the therapeutic molecule) directly to the site where the medicine is intended to act ("adjacent to the disc herniation"). **A6494** Moreover it is a preferred embodiment. Thus, Tobinick fully described epidural administration as that phrase would be understood by a person of ordinary skill in the art reading Olmarker's '995 patent.

However, the Court need not decide whether substantial evidence supports the Board's factual findings in order to reverse the Board, because its holding depends on a claim construction analysis that should also be reversed, on grounds of legal error. Claim construction is a matter of law, which is reviewed *de novo*. The Board relied on a dictionary definition of "local" administration, and expert testimony asserting that the '995 patent specification is "consistent" with that

dictionary definition. The Board then imported limitations on the scope of

"administered locally" and "administered epidurally" from Olmarker's '995 patent

specification into the claims. That was error. The Board is constrained by 35 USC

§112 on methods of claim construction. Claim construction is an issue of law. In

the absence of an express intent to impart a novel meaning to given terms, the

words in a claim are presumed to take on the ordinary and customary meanings

attributed to them by those of ordinary skill in the art. See, e.g., Teleflex, Inc. v.

Ficosa N. Am. Corp., 299 F.3d 1313, 1325, 63 USPQ2d 1374, 1380 (Fed. Cir.

2002).  Instead of invoking the ordinary and customary meaning of "administered

locally" and "administered epidurally" the Board construed these terms so

narrowly that Tobinick's description of treating a herniated disc by epidural

administration adjacent to the site of disc herniation (**A1564, 3-4**) was held to be

insufficient as a written description of the claimed methods. There is no basis in

law or in fact for adopting the narrow construction given to Tobinick's copied

claim language as "described" by Olmarker. Tobinick's explicit description of

*epidural* administration "adjacent to the disk herniation" necessarily puts the drug

where the nucleus pulposus is causing the symptoms of the nerve disorder. Under

any recognizable claim construction analysis, the '205 specification supports

Tobinick's copied claims

10

## Inequitable Conduct Summary

Two of the five involved Olmarker patents (6,649,589 and 7,708,995) were also involved in a co-pending interference (105,842) between Junior Party Olmarker and Senior Party Le.  In that case, Olmarker filed a motion for no interference-in-fact, which was granted. Eventually Tobinick requested permission to file a motion for inequitable conduct in this case, as various conflicting facts came to light during cross examination of Olmarker's expert witnesses. The most striking fact was that Olmarker apparently relied on expert testimony in the '842 interference that was an unmistakably false affidavit. The Board relied on this (uncontested) testimony, and granted Olmarker's motion for no interference-in-fact in the '842 interference, based solely on the representations of fact in this affidavit. There was no other evidence considered. But for that testimony, Olmarker's motion would have been denied. The consequences of denial would have been cancellation of all claims in the Olmarker's 6,649,589 and 7,708,995 patents. That outcome was inevitable because Olmarker was the Junior Party and had asked for no other relief. Because the sole basis upon which Olmarker distinguished the '589 and '995 claims from claim 9 in Senior Party Le's '488 application was false, those two Olmarker patents are *prima facie* anticipated or obvious over the Le '488 application, which presumption flows logically from the original declaration of Interference No. 105,842. **A7676**

11

Tobinick informed Olmarker about this false affidavit issue before the '842 interference had terminated. Olmarker therefore had a duty of candor to correct the erroneous basis for the Board's Decision on Motion. See <u>J.P. Stevens & Co. v. Lex Tex Ltd.</u>, 747 F.2d 1553 (Fed. Cir. 1984). Despite learning that its sole basis for distinguishing the '589 and '995 patent claims from claim 9 of the Le '488 application was incorrect, Olmarker continues to assert its '589 and '995 patents against Tobinick, showing a lack of candor and violating MPEP 2001.03 and CFR 1.56(a).

At the APJ's order, Tobinick submitted a five page paper outlining its evidence for inequitable conduct. (**A7674-7680**) The next day that request was dismissed "at this time" pending factual determinations by the Board when deciding the motions. The Board stated that "inequitable conduct may be revisited." **A7689-7690**  In its Decision on Motions, the Board held that it need not consider the issues of inequitable conduct raised by Tobinick in this interference and prior interference 105,842 because the Board's opinion in this case "does not hinge on" [the material fact that was allegedly knowingly misrepresented in the '842 interference] and, the Board concluded, because "the prior art status of the 'Le '488 application was not raised in this interference, we do not consider Tobinick's allegations." **A26, 14-23**

12

The Board abused its discretion in not letting Tobinick present the actual evidence of inequitable conduct in view of the *prima facie* case outlined, which violates the Board's duty to protect the public interest and Supreme Court precedent. ("The equitable powers of the court can never be exerted in behalf of one . . . who by deceit or any unfair means has gained an advantage.") <u>Keystone Driller Co. v. Gen. Excavator Co.</u>, 290 U.S. 240 (1933). In cases involving affirmative egregious misconduct, "but for materiality" need not be proven. An example of affirmative egregious misconduct is filing an unmistakably false affidavit. ("When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.") <u>Therasense, Inc. v. Becton, Dickinson & Co.</u>, 649 F.3d 1276 (Fed. Cir. 2011) (en banc).

The Board's failure to consider credible allegations of affirmative egregious misconduct is legal error as well as an abuse of discretion. The PTO is governed by the Administrative Procedure Act ("APA") and PTO decisions are reviewed under the APA standard. <u>Dickinson v. Zurko,</u> 527 U.S. 150, 152 (1999). Thus, your review of the Board's legal conclusions are without deference. Tobinick should be permitted to file a motion for inequitable conduct.

# <u>ARGUMENT</u>

## STANDARD OF REVIEW

Your standard of review for factual findings of the Board is governed by 5 U.S.C. §706. <u>Dickinson v. Zurko</u>, 527 U.S. 150, 159-60, 119 S. Ct. 1816, 144 L.Ed. 2d 143 (1999). Your standard of review to support a Board finding of fact is whether it is supported by "substantial evidence." <u>In re Gartside</u>, 203 F.3d 1305, 1314, 53 U.S.P.Q.2D 1769, 1774-75 (Fed. Cir. 2000). Your standard of review of legal conclusions by the Board is *de novo* review. <u>In re Elsner</u>, 381 F.3d 1 125, *; 2004 U.S. App. LEXIS 16708, **; 72 U.S.P.Q.2D (BNA) 1038 (Fed. Cir. 2004).

5 USC §706 is entitled "Scope of review," and it states that:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall--
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be--
>
> (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

The Patent and Trademark Office ("PTO") is governed by the Administrative Procedure Act ("APA"), and PTO decisions are reviewed under the APA standard.

14

Dickinson v. Zurko, 527 U.S. 150, 152 (1999).  The standard of review for abuse

of discretion, In re Sang-Su Lee, 277 F.3d 1338, 1342-43 (Fed. Cir. 2002):

> For judicial review to be meaningfully achieved within these
> strictures, the agency tribunal must present a full and reasoned
> explanation of its decision.  The agency tribunal must set forth its
> findings and the grounds thereof, as supported by the agency record,
> and explain its application of the law to the found facts.  The Court
> has often explained: The Administrative Procedure Act, which
> governs the proceedings of administrative agencies and related
> judicial review, establishes a scheme of "reasoned decision making."
> Not only must an agency's decreed result be within the scope of its
> lawful authority, but the process by which it reaches that result must
> be logical and rational.  Allentown Mack Sales and Service, Inc. v.
> National Labor Relations Bd., 522 U.S. 359, 374 (1998) (citation
> omitted).  This standard requires that the agency not only have
> reached a sound decision, but have articulated the reasons for that
> decision.  The reviewing court is thus enabled to perform meaningful
> review within the strictures of the APA, for the court will have a basis
> on which to determine "whether the decision was based on the
> relevant factors and whether there has been a clear error of judgment."
> Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).
> Judicial review of a Board decision denying an application for patent
> is thus founded on the obligation of the agency to make the necessary
> findings and to provide an administrative record showing the evidence
> on which the findings are based, accompanied by the agency's
> reasoning in reaching its conclusions.  See In re Zurko, 258 F.3d
> 1379, 1386, 59 USPQ2d 1693, 1697 (Fed. Cir. 2001) (review is on the
> administrative record); In re Gartside, 203 F.3d 1305, 1314, 53
> USPQ2d 1769, 1774 (Fed. Cir. 2000) (Board decision "must be
> justified within the four corners of the record").

15

## THE BOARD'S CLAIM CONSTRUCTION, AND ITS ERRORS

Throughout the interference, Olmarker relied on the testimony of Dr. Gunnar Andersson.  (**A1305-1548, A8058-8087, A5485-5536, A8510, A6625-6694, A7261-7313)**. Tobinick relied on testimony by Dr. Ian Clark**,** Dr. Mel Richardson (**A4052-4057, A4467-4470**) and Dr. Alan Weinberger (**A6348-6581**). The Exhibit List is **A7029.**

TNF-α is a macromolecule that can cause pain and inflammation in nerve tissues. Antibodies that bind to TNF-α can reduce such inflammation and relieve such pain. The pain associated with herniated discs is often caused by a type of tissue called "nucleus pulposus" which is a source of TNF-α. This tissue is normally found inside vertebral discs. Disc herniation allows nucleus pulposus to leak out and irritate nerves in the spine by direct physical contact with nearby regions of the spinal cord. **A6383-6384**

Medical imaging techniques (e.g. MRI) can show a herniated disc and where nucleus pulposus is impinging on the adjacent spinal cord and/or nerve roots. **A6403**

16



Patent Interference No. 105,866 was requested by Tobinick [TACT IP, LLC,

appellant] in application Serial No, 12/714,205, using claims copied from

17

Olmarker patents 7,708,995 and 7,811,990. **A6, 8-13**. The "Olmarker '995 patent" is representative. **A16, 4-6.** Tobinick's claims 68 and 69 **(A187**) are representative (below, emphasis added). Tobinick's claim 68 is also the Count of the interference.

**A292 and A62**

> Claim 68:    A method of **treating or alleviating one or more symptoms of a nerve disorder mediated by nucleus pulposus** in a mammal in need of such treatment comprising the step of administering a therapeutically effective amount of a TNF-α inhibitor to the mammal, wherein said TNF-α inhibitor is an antibody that blocks TNF-α activity, wherein **the antibody is administered locally**.

> Claim 69:    The method of claim 68, wherein **the antibody is administered epidurally** to the mammal.

The Board referred to Olmarker's '995 patent specification to construe Tobinick's claims under <u>Agilent Tech., Inc. v. Affymetrix</u>, Inc, 567 F.3d 1366, 1375 (Fed. Cir. 2009); specifically, with regard to the limitations" the antibody is administered locally" (Tobinick claim 68) and "the antibody is administered epidurally." (claim 69) **A16, 20-25; A21, 22 – A22, 10; A23, 5-8.**

The Board found that:

> Tobinick argues that intrathecal and epidural routes of administration are localized forms of administration disclosed in the specification of the '205 application.  (Tobinick Opp. 2, Paper 300, at 12; FFs 17 and 18, Tobinick '205 application, Ex. 1008, at 8:19-21 and 9:3-6.) According to Olmarker, though, such injections are not described as being **administered directly to the site** where the medicine is intended to act. For example, **epidural administration is described as being administered "to the anatomic area adjacent to the disc herniation" (FF 19,**

18

> **Tobinick '205 application, Ex. 1008, at 12:3-4), instead of to
> the site of disc herniation**. (Olmarker Motion 2, Paper 162, at 10-
> 11.) Olmarker relies on Dr. Andersson's testimony to argue that
> when administration is at an anatomic area adjacent to the site of
> disc herniation, any functional distinction between local and
> systemic administration is removed. (Id., FF 20, Andersson Decl.,
> Ex. 1060, §VI, ¶ 29, pp. 60-61.)

**A21 , A22** (emphasis added), citing to **A1564** (EX 1008)

The Board found that:

> The balance of the evidence on this record persuades us that the
> specification of the Tobinick '205 application does not describe a
> method of treatment wherein anti-TNF-α antibody is "administered
> locally" to treat or alleviate symptoms of a nerve disorder mediated
> by nucleus pulposus. Olmarker has shown that the specification of
> **the '205 application is directed to administering TNF inhibitor
> near or adjacent to a nerve disorder, but not directly to the site
> where the medicine is intended to act.** Because we are
> constrained under *Agilent* to use the Olmarker '995 patent
> specification to construe Tobinick's claims, we cannot find, based
> on this record, that the specification of the '205 application
> provides written description for the methods claimed by Tobinick.

**A23** (emphasis added)

The Board held that:

> In light of these definitions and the use of the term "local" in
> Olmarker's specification, **we construe** Tobinick's claims as being
> directed to administering TNF-α inhibitor **directly to the site
> where it is intended to act**, that is, to the location **where the
> <u>nucleus pulposus is causing the symptoms</u> of the nerve
> disorder**. The limitation "administered locally" excludes systemic
> administration away from the site where the  TNF-α inhibitor is
> intended to act.

**A19, 6-11 (**bolding and underlining added)

19

The factual distinction underlying the Board's holding ("epidural administration is described [by Tobinick] as being administered "to the anatomic area adjacent to the disc herniation" instead of "directly to the site where it is intended to act" or "where the nucleus pulposus is causing the symptoms" is a *non sequitur.* It is apparent from the Board's words, properly understood, that they all describe the same place, explained in detail below. Furthermore, the Board's alternative characterization of Olmarker's method ("epidural administration is described [by Tobinick] as being administered 'to the anatomic area adjacent to the disc herniation' (FF 19…) instead of to the site of disc herniation.")  is difficult to understand, because "the site of disc herniation" is ambiguous. Taken literally "the site of disc herniation" implies putting the drug on (or into) the disc itself, which is not possible to do by epidural administration. Presumably that would require some form of intradiscal or peridiscal injection. If this finding refers to putting the drug on the spinal nerve roots that are being damaged by nucleus pulposus, that is exactly where Tobinick said to put it. ("In another preferred embodiment injection of the therapeutic molecule to the anatomic area adjacent to the disc herniation is accomplished by epidural injection.") **A1564, 3-4**.



FIG. 18. Mechanism of bilateral ventral pressure from central herniation of nucleus pulposus. (After Kristoff and Odom.)

Epidural administration places a drug *on* the dural membrane (i.e., *epi-dural*). **A6393-6395**   That is where nucleus pulposus is causng the symptoms of the nerve disorder. Focusing specifically on the words in the holding: "we construe Tobinick's claims … administering … directly to **the site where it is intended to act**, that is, to the location **where the nucleus pulposus is causing the symptoms** of the nerve disorder," one sees that this is a location on the dura adjacent to the herniated disc, i.e, where nucleus pulposus is causing the symptoms. That location is exactly where Tobinick said to administer the antibody. That is, *epidural*

21

injection is performed "adjacent to the disc herniation" according to Tobinick, so the drug necessarily goes to a region of the dura which is adjacent to the site of disc herniation (i.e., "where the medicine is intended to act" as the Board puts it. This anatomical location is indicated by Tobinick's words since nucleus pulposus remains near the disc it leaked from. **A6378**

So, treating a nerve disorder mediated by nucleus pulposus by epidural injection "to the anatomic area adjacent to the disc herniation," describes targeting the spinal nerve roots. Because the injection is "epidural" and also "adjacent to the site of disc herniation," the drug can go nowhere else. Certainly it is nowhere different from Olmarker's method.

Tobinick's description of epidural administration "adjacent to the disk herniation" necessarily puts the drug where the medicine is intended to act. **A6393-6394** Epidural administration "directly to the site where the medicine is intended to act" (according to the Board's view of Olmarker) is the same spot.

On the other hand, epidural administration "to the site of disc herniation," according to the Board's other view of Olmarker does not quite make sense. The Board characterized Olmarker's method in several different ways; the first one being administration **to the site of disc herniation**, as if the antibody were going to be injected directly into a herniated disc (not possible using epidural injection); the second one being administration **directly to the site where the medicine is**

22

**intended to act**; the third one being **where the nucleus pulposus is causing the symptoms of the nerve disorder.** The second and third formulations make sense, since "epidural" injection will target the place where nerve tissue (still under the dura) is being damaged by contacting displaced nucleus pulposus (still over the dura). Spinal nerve roots and the dural membrane are almost never pierced or contacted by herniated disc material itself. Hence the Board's assertions that Olmarker teaches administration "to the site of disc herniation" and that this location is somehow different than what Tobinick disclosed, are wrong and confused.

It appears that the Board's error arose from the fact that Olmarker's '995 patent fails to disclose "administered locally" in association with any method of treating or alleviating symptoms of a nerve or spinal disorder. The only occurrence of "administered locally" in the Olmarker '995 patent is at col. 27, line 18 (**A3279**), and refers to an antibody being physically applied, locally, in the isolated nucleus pulposus used in the "Series-2" pig experiments described below.

The Olmarker '995 patent does not literally define or even describe what is meant by "administered locally" or "administered epidurally." Olmarker actually relied on a dictionary definition of "local." (i.e., "Local is defined in the medical arts as restricted or pertaining to one spot or part; not general.") **A3545-3545** and Olmarker's expert Dr. Andersson relied on this dictionary definition, and his own

understanding of the Series-2 experiments in the '995 patent, to conclude: "Thus, "local" administration means administration directly to the site where the medicine is intended to act. *MF 44; Ex. 1060, p. 57, § VI ¶ 21*." (**A3361**) In its Opposition 2 (**A5993-6035**) Tobinick pointed to another definition, in Stedman's Medical Dictionary (**A8556-8659)** which defines "local" as "Having reference or confined to a limited part; not general or systemic." Stedman's definition does not mention "one spot." The Board found that these two dictionary definitions of "local" are not very different (**A18**) and Tobinick agrees that there is no critical difference between these two definitions, but it helps to explain where the Board's claim construction came from.

In Olmarker's Series-2 experiments, nucleus pulposus tissue is extracted from pig vertebral discs and mixed *ex vivo* with a TNF-α binding antibody. This mixture is physically placed onto surgically exposed, but otherwise healthy pig spinal nerve roots. **A17** (Actually, the nucleus pulposus mixture is placed on the dura; the exposed nerve roots are presumably still covered by the dural membrane, but the Series-2 experimental does not explain.) This experiment is an animal model for epidural injection because it places nucleus pulposus and antibody on the dura, just like epidural injection adjacent to a herniated disc would do according to Tobinick. This experiment models a process in which nucleus pulposus has leaked from a herniated disc and is impinging upon adjacent nerve

24

roots. The affected nerve roots are generally adjacent to the site of disc herniation (not at the site of disc herniation, which is the ruptured disc itself) because nucleus pulposus remains near its source disc. **A6403**

This animal model was used on multiple pigs to assay whether the TNF-α binding antibody could neutralize the damaging effects normally inflicted upon healthy nerve roots by application of isolated nucleus pulposus tissue. Tobinick concedes that this assay is relevant to the treatment of disc-related nerve disorders, because when nucleus pulposus leaks from a herniated disc it can directly cause pain and inflammation associated with vertebral disc injury, by releasing TNF-α. However, because nucleus pulposus tends to stay near the disc that emitted it, any such nerve damage tends to occur in nerve roots and/or spinal cord areas adjacent to the site of the herniated disc. **A6403**

Tobinick's '205 application explicitly describes how to treat the same type of nerve disorder being modeled by Olmarker's Series-2 experiments, i.e., "In another preferred embodiment injection of the therapeutic molecule to the anatomic area adjacent to the disc herniation is accomplished by epidural injection." **A1564, 3-4**. This statement unambiguously describes treating symptoms of a nerve disorder mediated by nucleus pulposus ("disc herniation") by epidural administration ("injection") of a TNF-α binding antibody ("the therapeutic molecule) directly to the site where the medicine is intended to act ("adjacent to

the disc herniation"). **A6494** Moreover it is a preferred embodiment. Thus,

Tobinick fully described epidural administration as that phrase would be

understood by a person of ordinary skill in the art reading Olmarker's '995 patent.

The Series-2 experiments do not literally describe a therapeutic method, of

course, since it is not "therapeutic" to remove nucleus pulposus from an vertebral

disc, immerse nucleus pulposus in a solution containing antibodies, and then apply

the mixture to surgically exposed, but otherwise healthy nerve roots.  (I try not to

think about this assay too much.) The Board recognized that Olmarker's Series-2

experiments do not literally describe a therapeutic method, but nevertheless found

them useful for construing the therapeutic claim terms "administered locally" and

"administered epidurally," specifically "because the experiments demonstrate at

least some of the characteristics of the claimed methods." (**A34, 22-23**)

Presumably, the characteristics which the Board had in mind are: an explicit use of

TNF binding antibody *locally* in a model of a nerve disorder mediated by nucleus

pulposus (**A23, 11-12**), and an implicit model of epidural administration (**A17, 9-

10**). However, Olmarker's Series-2 experiments are not "words or expressions of

manifest exclusion or restriction". <u>Liebel-Flarsheim Co. v. Medrad, Inc.</u>, 358 F.3d

898, 905; 2004 U.S. App. LEXIS 2218, _; 69 USPQ2d 1801, _ (Fed. Cir. 2004).

They are examples of an antibody mixed with nucleus pulposus and applied to

healthy nerve roots, not definitions limiting the scope of a therapeutic term. In the

26

absence of an express intent to impart a novel meaning to "administered locally" and "administered epidurally," those claim terms are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art. See, e.g., <u>Teleflex</u>, 299 F.3d at1325, 63 USPQ2d at 1380.

It is apparent that Tobinick and Olmarker each described targeting the same anatomical location by epidural administration using different language. However, the Board characterized Olmarker's method as administering the drug "**directly to the site where it is intended to act, that is, to the location where the nucleus pulposus is causing the symptoms of the nerve disorder**" while holding that place is not what Tobinick described. That holding is based on factual error unsupported by substantial evidence. And precisely what the Board's other formulation "**to the site of disc herniation**" is supposed to mean is not clear. Either it means "on the dural membrane," or it means "on (or into) the vertebral disc itself." The former meaning is exactly where Tobinick said to administer the drug, the latter meaning is a physical impossibility using epidural injection.

The Board's erroneous fact finding was based on testimony by Dr. Andersson. That testimony is not supported by substantial evidence. **A6494**

However, while the Board's erroneous factual determinations should be appreciated to understand what happened in this case, the Court need not decide whether substantial evidence supports those factual findings in order to reverse the

27

Board. That is because the Board's holding depends on a claim construction analysis that should be reversed on grounds of legal error. Claim construction is a matter of law, which is reviewed *de novo*.  In re Elsner, *supra*.

As explained above, to construe the claims the Board relied on a dictionary definition of "local" administration, and expert testimony asserting that the '995 patent specification is "consistent" with that dictionary definition. The Board then imported limitations on the scope of "administered locally" and "administered epidurally" from Olmarker's '995 patent specification into the claims. That was error. This process of claim construction was justified by citing the rule in *Agilent*. But, while the Board is constrained under *Agilent* to use Olmarker's '995 specification to construe Tobinick's copied claims, the Board is also constrained by 35 USC §112 on methods of claim construction.

Claim construction is an issue of law. As such, "[a] patent covers the invention or inventions which the court, in construing its provisions, decides that it describes and claims." Markman v. Westview Instruments, Inc.,52 F.3d 967, 979, 34 USPQ2d 1321, 1329; (Fed. Cir. 1995); aff'd at 117 S.Ct. 1040, 38USPQ2d 1461 (1996). Claim construction analysis begins with the words of the claim. See Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir. 1996). "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the

patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.' 35 U.S.C. §112, ¶ 2." Interactive Gift Express, Inc. v.Compuserve, Inc., 256 F.3d 1323, 1331, 59 USPQ2d 1401, 1406 (Fed. Cir. 2001). The words used in the claims are examined through the viewing glass of a person skilled in the  art. Tegal Corp. v. Tokyo Electron Am., Inc., 257 F.3d 1331, 1342, 59 USPQ2d 1385,1393 (Fed. Cir. 2001).

In the absence of an express intent to impart a novel meaning to given terms, the words in a claim are presumed to take on the ordinary and customary meanings attributed to them by those of ordinary skill in the art. See, e.g., Teleflex, 299 F.3d at1325, 63 USPQ2d at 1380. The ordinary and customary meaning of a claim term may be determined by reviewing a variety of sources. Some of these sources include the claims themselves, see Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357, 52USPQ2d 1029, 1033 (Fed. Cir. 1999); dictionaries and treatises, Texas Digital Systems,Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202, 64 USPQ2d 1812, 1818 (Fed. Cir. 2002); and the written description, the drawings, and the prosecution history, see, e.g., DeMariniSports, Inc. v. Worth, Inc., 239 F.3d 1314, 1324, 57 USPQ2d 1889, 1894 (Fed. Cir. 2001).

In this case, instead of invoking the ordinary and customary meaning of "administered locally" and "administered epidurally" the Board construed these terms very, very, very narrowly, based on a dictionary definition and an expert's

interpretation of an experiment. This claim construction is so narrow that even Tobinick's straightforward description of treating a herniated disc by epidural administration adjacent to the site of disc herniation (**A1564, 3-4**) was held to be insufficient as a written description of the claimed methods.

For the reasons given above, there is no basis in law or in fact for adopting the narrow construction given to Tobinick's copied claim language as "described" by Olmarker. Tobinick's explicit description of *epidural* administration "adjacent to the disk herniation" necessarily puts the drug where the nucleus pulposus is causing the symptoms of the nerve disorder. Under any recognizable claim construction analysis, the '205 specification supports Tobinick's copied claims.

**INEQUITABLE CONDUCT**

Two of the five involved Olmarker patents (6,649,589 and 7,708,995) were also involved in a co-pending interference (105,842) between Junior Party Olmarker and Senior Party Le.  In that case, Olmarker filed a motion for no interference-in-fact, which was granted. Eventually Tobinick requested permission to file a motion for inequitable conduct in this case, as various conflicting facts came to light during cross examination of Olmarker's expert witnesses. The most striking fact was that Olmarker apparently relied on expert testimony in the '842 interference that was in the form of an unmistakably false affidavit. Because Party

30

Le did not oppose the only motion in the '842 interference, that affidavit was never contested.

The Board relied on this uncontested testimony, which was not supported by any scientific literature, and granted the joint motion for no interference-in-fact in the '842 interference, based solely on the representations of fact in an unmistakably false affidavit.  There was no other evidence considered. <u>But for</u> that testimony, Olmarker's motion would not have been granted. The consequences of denial would have been cancellation of all claims in the Olmarker's 6,649,589 and 7,708,995 patents involved in this case. That outcome was inevitable because Olmarker was the Junior Party and had asked for no other relief. Because the sole basis upon which Olmarker distinguished the '589 and '995 claims from Senior Party Le's application 10/227,488 was false, those two Olmarker patents are *prima facie* anticipated or obvious over the Le '488 application, which presumption flows logically from the original declaration of Interference No. 105,842. **A7676**

Tobinick informed Olmarker about this false affidavit issue before the '842 interference had terminated. Olmarker therefore had a duty of candor to correct the erroneous basis for the Decision on Motion. See <u>J.P. Stevens & Co. v. Lex Tex Ltd.</u>, 747 F.2d 1553 (Fed. Cir. 1984). Despite learning that its sole basis for distinguishing the '589 and '995 patent claims from claim 9 of the Le '488 application was incorrect, Olmarker continued to assert its '589 and '995 patents

31

against Tobinick, e.g., in Olmarker Motions 5, 6, 7 and 9 (adding claims from the '589 and '995 patent), while knowing that  that the Le '488 application is material prior art against its claims. Olmarker proceeded all the way through Olmarker Replies 5, 6, 7 and 9 without ever acknowledging that its claims are *prima facie* anticipated by Le's '488 application, thus showing a lack of candor and violating MPEP 2001.03 and CFR 1.56(a).

At the APJ's order, Tobinick submitted a five page paper outlining its case for inequitable conduct. (**A7674-7680**) The next day that request was dismissed "at this time" pending factual determinations by the Board when deciding the motions. The Board stated that "inequitable conduct may be revisited." **A7689-7690** Tobinick later renewed its request to file an inequitable conduct motion, before any of the Preliminary Motions were decided, that request was also denied.  **A11354-11355**  In its Decision on Motions, the Board held that it need not consider the issues of inequitable conduct raised by Tobinick in this interference and prior interference 105,842, because the Board's opinion in this case "does not hinge on" the material fact that was allegedly knowingly misrepresented in the '842 interference and, the Board concluded, because "the prior art status of the 'Le '488 application' was not raised in this interference, we do not consider Tobinick's allegations." **A26, 14-23**

32

Case: 13-1499    Document: 21    Page: 39    Filed: 09/03/2013

The Board abused its discretion by not letting Tobinick present the actual evidence of inequitable conduct after the *prima facie* case outlined in its five page paper (**A7674-7680**), which violates the Board's duty to protect the public interest and Supreme Court precedent. ("The equitable powers of the court can never be exerted in behalf of one . . . who by deceit or any unfair means has gained an advantage.") Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240 (1933); Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944); and ("patent claims infected with fraud and perjury" where assignee knew that its employee "gave false dates as to the conception, disclosure, drawing, description and reduction to practice" during interference proceeding.) Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806 (1945).

In cases involving affirmative egregious misconduct, "but for materiality" need not be proven. An example of affirmative egregious misconduct is filing an unmistakably false affidavit. ("When the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit, the misconduct is material.") Therasense, Inc. v. Becton, Dickinson & Co., 649 F.3d 1276 (Fed. Cir. 2011) (en banc).

The Board's failure to consider Tobinick's credible allegations of affirmative egregious misconduct was legal error as well as an abuse of discretion. The PTO is governed by the Administrative Procedure Act ("APA"). PTO

33

decisions are reviewed under the APA standard. <u>Dickinson v. Zurko,</u> 527 U.S. 150, 152 (1999). Thus, your review of the Board's legal conclusions are without deference. Tobinick should be permitted to file a motion for inequitable conduct.

If the Court rules against Tobinick on the 35 USC §112 written description argued above, it would mean that Tobinick had no standing to continue the '866 interference, since all of its pending claims would have been held invalid. If that holding were to occur, the Court is respectfully requested to order the Board to grant Tobinick leave to file a Motion, to add new claims to its '205 application that comply with 35 USC §112, so that Tobinick will have standing in the interference.

## CONCLUSIONS AND STATEMENT OF RELIEF SOUGHT

The Board erred in granting Olmarker's Motion 2 regarding 35 USC §112 written description. Appellant requests that you reverse the Board's decision.

The Board erred in refusing to grant Tobinick permission to file a motion for inequitable conduct. Appellant requests that you order the Board to grant Tobinick permission to file a motion for inequitable conduct in the '866 interference.

If the Court rules against Tobinick on the 35 USC §112 written description issue above, Appellant requests that you order the Board to give Tobinick permission to file a Motion adding new claims to its '205 application that comply

with 35 USC §112, so that Tobinick will have standing to remain in the

interference and retain the ability to file a motion for inequitable conduct.


Respectfully submitted,

/s/RobertHahl
Robert Hahl
Neifeld IP Law, PC
4813-B Eisenhower Avenue
Alexandria, VA 22304
703-415-0012
Counsel for Appellant

# ADDENDUM

Paper 615

Mail Stop Interference
P.O. Box 1450                                           Filed: 22 January 2013
Alexandria Va 22313-1450
Tel: 571-272-4683
Fax: 571-273-0042

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

EDWARD **TOBINICK**,
Junior Party
(Application 12/714,205),

v.

KJELL **OLMARKER** and BJÖRN RYDEVIK
Senior Party
(Patents 7,708,995, 7,811,990, 7,906,481, 8,057,792, and 6,649,589).

———————

Patent Interference No. 105,866
(Technology Center 1600)

———————

1    **Decision on Motions – Bd. R. 125(a)**

2    *Before* Richard Torczon, Sally Gardner Lane, and Deborah Katz, *Administrative*

3    *Patent Judges.*

4    Opinion by Katz, *Administrative Patent Judge.*  Concurring opinion by Torczon,

5    *Administrative Patent Judge.*

6

-1-

A1

1      **I.    Statement of the Case**

2      The Interference is before a motions panel for consideration of the parties'

3  pending non-priority motions.  An oral argument was held on 4 December 2012.

4  (Transcript at Paper 614.)  Robert Hahl represented Edward Tobinick and Todd Walters

5  represented Kjell Olmarker and Björn Rydevik.

6      **A.    The Parties**

7      Edward Tobinick ("Tobinick") is involved based on his Patent Application

8  12/714,205 ("the Tobinick '205 application"), which was filed 26 February 2010.

9  (Declaration, Paper 1, at 3.)  Claims 68, 69, and 71-80, all of the pending claims of the

10  Tobinick '205 application (Tobinick Clean Copy of Claims, Paper 10, at 2), were

11  designated as corresponding to the Count (Declaration, Paper 1, at 5).

12      Tobinick represents that Tact IP, LLC is the real party-in-interest.  (Tobinick

13  Notice of Real Party In Interest, Paper 11, at 2.)

14      Kjell Olmarker and Björn Rydevik ("Olmarker") are involved based on the claims

15  indicated for the following U.S. Patents:

| Patent | Involved claims |
|---|---|
| 7,708,995,<br>issued 04 May 2010 | 12 and 13 |
| 7,811,990,<br>issued 12 October 2010 | 13, 22, 31, 40, 45, 48,<br>49, and 51 |
| 7,906,481,<br>issued 15 March 2011 | 2, 20, 22, and 32 |
| 8,057,792,<br>issued 15 November 2011 | 10, 11, 23, and 24 |
| 6,649,589,<br>issued 18 November 2003 | 8, 18, 27, and 34 |

16

A2

1    (Declaration, Paper 1, at 3-5; and Redeclaration, Paper 27, at 3.)

2        Olmarker represents that Sciaticon AB, BioAssets Development Corporation,

3    Cephalon, Inc., and Teva Pharmaceutical Industries, Ltd., are the real parties-in-

4    interest.  (Olmarker Notice of Real Party In Interest, Paper 8, at 2.)

5    **II.    Subject Matter and Count**

6        Both Tobinick and Olmarker claim methods of inhibiting the action of a molecule

7    called TNF-α to achieve therapeutic results in patients with nerve disorders.  The parties

8    agree that TNF-α inhibitors are molecules that inhibit TNF-α activity by either binding

9    directly to it or preventing its release and that such molecules have been previously

10   used to treat diseases such as rheumatoid arthritis and Crohn's disease. (Andersson

11   Decl., Ex. 1060, §III, ¶ 23, p. 26, Weinberger Decl., Ex. 2097, ¶¶ 87, 88, 99.)  TNF-α

12   inhibitors were previously known to include antibodies.  (Andersson Decl., Ex. 1060, §

13   III, ¶ 23, p 26; Weinberger Decl., Ex. 2097, ¶ 98.)

14       The Count is claim 68 of the Tobinick '205 application, which recites:

15                A method of treating or alleviating one or more symptoms of a nerve
16                disorder mediated by nucleus pulposus in a mammal in need of such
17                treatment comprising the step of administering a therapeutically effective
18                amount of a TNF-α inhibitor to the mammal, wherein said TNF-α inhibitor
19                is an antibody that blocks TNF-α activity, wherein the antibody is
20                administered locally.
21
22   (Declaration, Paper 1, at 4; Tobinick Clean Copy of Claims, Paper 10, at 2.)  Thus, the

23   subject matter of the Interference is limited to methods that relate to symptoms of a

24   nerve disorder mediated by nucleus pulposus tissue.  The parties agree that the

25   nucleus pulposus is a jelly-like substance in the middle of a spinal disc, which can

26   become herniated, or displaced from its normal location in the disc.  (Andersson Decl.,

-3-

A3

1   Ex. 1060, §III, ¶¶ 6, 13, and 19, p. 14, 20, and 23; Weinberger Decl., Ex. 2097, ¶ 66.)

2   The Count is also limited to method in which the antibody is "administered locally."

3   **III.    Motions**

4   Tobinick has filed five motions, as follows.

5   •   Motion 1 for judgment against all of Olmarker's involved claims under

6   35 U.S.C. §135(b). (Paper 172.)

7   •   Motion 2 that Olmarker be denied benefit of International application

8   PCT/SE99/01671. (Paper 173.)

9   •   Motion 3 that Olmarker be denied benefit of Swedish Applications

10   9803276-6 and 9803710-4. (Paper 174.)

11   •   Motion 4 for permission to change the priority claims in application

12   11/262,528 (now Patent 8,119,127), application 10/269,745 (now Patent 6,982,089),

13   and application 10/236,097 (now abandoned).  (Paper 238.)  Tobinick's requests in

14   this motion are contingent on the granting of Olmarker Motion 3, for judgment that

15   Tobinick's involved claims are unpatentable over the prior art (Paper 163).  (Tobinick

16   Motion 4, paper 238, at 2.)

17   •   Motion 5 to exclude evidence. (Paper 363.)

18   Olmarker has filed 11 motions:

19   •   Motion 1 for judgment against all of Tobinick's involved claims under

20   35 U.S.C. §135(b).  (Paper 161.)

21   •   Motion 2 for judgment that all of Tobinick's involved claims are

22   unpatentable under 35 U.S.C. §112, first paragraph, for lack of written description and

-4-

A4

1  enablement.  (Paper 162.)

2  • Motion 3 for judgment that all of Tobinick's involved claims are

3  unpatentable under 35 U.S.C. §102 and or §103 over WO 00/18409.  (Paper 163.)

4  • Motion 4 that Tobinick be denied benefit as to any U.S. patent application.

5  (Paper 165.)

6  • Motion 5 that additional Olmarker claims of the involved Olmarker patents

7  be designated as corresponding to the Count.  (Paper 166.)

8  • Motion 6 that additional claims of Olmarker involved patent 6,649,589 be

9  designated as corresponding to the Count.  (Paper 167.)

10  • Motion 7 to substitute a new Count for the current Count.  (Paper 168.)

11  • Motion 8 for judgment that all of Tobinick's involved claims are

12  unpatentable under 35 U.S.C. §102 and/or §103 over the publication Olmarker and

13  Larsson, "Tumor Necrosis Factor α and Nucleus-Pulposus-Induced Nerve Root Injury,"

14  23 Spine 2538 (1998).  (Paper 240.)

15  • Motion 9 to introduce an additional claim to application 13/489,830 and

16  have it designated as corresponding to the Count.  (Paper 241.)  Olmarker's request in

17  this motion is contingent on the granting of Tobinick Motion 1 for judgment against

18  Olmarker's claims under 35 U.S.C. § 135(b).  (Olmarker Motion 9, Paper 241, at 1.)

19  • Motion 10, requesting reconsideration of the Order – Contingent Motion

20  (Paper 236) and authorization to file a motion to add claims in response to Tobinick

21  Motion 1.  (Paper 242.)

22  • Motion 11, requesting discovery, specifically communications between

1  Edward Tobinick and his counsel on issues relating to Tobinick Contingent Motion 4.

2  (Paper 270.)

3      We take up these motions in the order that secures the most just, speedy, and

4  inexpensive determination of the proceedings. *Berman v. Housey*, 291 F.3d 1345, 1352

5  (Fed. Cir. 2002); 37 C.F.R. § 41.125(a).  Olmarker argues in its Motion 2 that all of

6  Tobinick's involved application claims are unpatentable under 35 U.S.C. § 112, first

7  paragraph, for lack of adequate written description support. (Olmarker Motion 2, Paper

8  162, at 1.)  Because Tobinick's claims were copied from the Olmarker 7,708,995 and

9  7,811,990 patents for the purpose of provoking this Interference (*see* Olmarker Motion

10  2, Paper 162, at 2; Tobinick response to Olmarker MF[1] 1; Amendment filed in the

11  Tobinick '205 application, Ex. 1081, at 5), Olmarker's Motion 2 presents a threshold

12  issue.  *See* 37 C.F.R. § 41.201(2)(ii).  We exercise our discretion under 37 C.F.R.

13  § 41.125(a) to take up Olmarker Motion 2 first.

14      As discussed below, the preponderance of the evidence leads us to find that

15  Tobinick's claims are not fully supported by a written description in the specification of

16  the Tobinick '205 application.  Thus, Tobinick was not entitled to file the claims used to

17  provoke this Interference and the Interference was mistakenly declared.  *See Berman*,

18  291 F.3d at 1353.  In light of this decision, we do not reach Tobinick Motion 1, which is

19  directed to the alleged unpatentability of Olmarker's claims under 35 U.S.C. § 135(b).

20      We note that Tobinick Motion 1 does not present a threshold issue under

21  § 41.201 because Tobinick, as junior party applicant, has asserted that Olmarker's

22  patent claims are unpatentable over claims of uninvolved Tobinick U.S. Patent

1   6,015,557.  In this interference, Olmarker, not Tobinick, is the patentee who would be

2   entitled to repose.  At best, Tobinick's motion raises a patentability issue.  *See In re*

3   *Berger*, 279 F.3d 975, 982 (Fed. Cir. 2002); *Strelchenko v. Campbell*, 2002 WL

4   1300267, at *2-3 (BPAI June 10, 2002) (Interference 104,809).  Thus, in light of the

5   decision that Tobinick's application claims lack written description support, we do not

6   consider Tobinick Motion 1.

7        In addition, though we consider Tobinick Motion 5 to exclude evidence, we do not

8   reach any of Tobinick's or Olmarker's other motions, because the issues raised are

9   moot in light of our decision that Tobinick's claims are unpatentable for lack of written

10  description support.

11  **IV.      Analysis – Olmarker Motion 2**

12       In its Motion 2, Olmarker argues that the Tobinick specification cannot provide a

13  written description of the subject matter Tobinick claims because, in part, it does not

14  describe treating "symptoms of a nerve disorder mediated by nucleus pulposus" with

15  antibodies "administered locally."  (Olmarker Motion 2, Paper 162, at 1.)  Olmarker also

16  argues that the Tobinick specification does not provide sufficient enabling disclosure to

17  support the claimed methods.

18  <u>Witnesses</u>

19       Olmarker relies on the testimony of Gunnar Bengt Johan Andersson, M.D.,

20  Ph.D., to support the arguments in Motion 2.  (Declaration of Gunnar Bengt Johan

21  Andersson, M.D., Ph.D. ("Andersson Decl."), Ex. 1060.)  Dr. Andersson testifies that he

22  is currently a Professor and Chairman Emeritus in the Department of Orthopedic

---

[1] "MF" indicates Material Fact.

1    Surgery and Professor in Spinal Deformities at the Rush University Medical College in

2    Chicago, IL.  (Andersson Decl., Ex. 1060, § II, ¶ 6, p. 8.)  Dr. Andersson testifies that

3    since 1975 he has served in many academic and administrative positions in medical

4    schools, specifically in departments of orthopedic surgery.  (Andersson Decl., Ex. 1060,

5    § II, ¶ 7, p. 9.)  Dr. Andersson testifies that he obtained the degree of Candidate of

6    Medicine form the University of Zurich, Switzerland, a Medicine Licenciate Certificate

7    and a Ph.D. in Medical Science from the University of Göteborg, Sweden. (Andersson

8    Decl., Ex. 1060, § II, ¶¶ 3-5. p. 8.)  Dr. Andersson also testifies that he has conducted

9    research in orthopedic medicine and has authored more than 300 original peer-

10   reviewed and invited medical and scientific publications, many of which concern causes

11   and treatments of spinal disorders and symptoms associated with such disorders.

12   (Andersson Decl., Ex. 1060, § II, ¶ 10. p. 11-12; see also Curriculum Vitae Gunnar

13   Bengt Johan Andersson, M.D., Ph.D., Ex. 1061.)  Dr. Andersson testifies that he is a

14   National Institutes of Health-funded researcher and has a grant to study degenerative

15   vertebral disc disease.  (Id.)

16        Dr. Andersson is qualified to testify on the subject matter of the Interference.

17        Tobinick raises concerns about the scientific bases Dr. Andersson relies on and

18   an asserted bias.  (Tobinick Opp. 2, Paper 300, at 4; see also Tobinick Motion 5, Paper

19   363, at 2 and 10-11.) Tobinick argues that because Dr. Andersson included a statement

20   reserving the "right to amend, supplement, or otherwise modify [his] opinions . . . ."

21   (Second Declaration of Gunnar Bengt Johan Andersson ("Second Andersson Decl."),

22   Ex. 1085, §IV, ¶ 1, p. 28), his testimony is unreliable.  (Tobinick Opp. 2, Paper 300, at 4;

-8-

A8

1  *see also* Tobinick Motion 5, Paper 363, at 3, 10-11, and 13.)  Olmarker argues that this

2  statement is consistent with the role an expert witness plays in a trial, where they have

3  an affirmative duty under the Federal Rules of Civil Procedure 26(a)(2), 26(a)(2)(E), and

4  26(e)(2) to supplement their disclosures, including written reports.  (Olmarker Reply 2,

5  Paper 343, at 9.)

6      Dr. Andersson declares that his statements are believed to be true, with the

7  knowledge that willful false statements are punishable under 18 U.S.C. § 1001.

8  (Anderson Decl., Ex. 1060, § XIV, p. 150; Second Andersson Decl., Ex. 1085, § IV, ¶ 2,

9  p. 28.)  Thus, we are not persuaded that Dr. Andersson's testimony is generally

10  unreliable merely because he expressed a wish to reserve the right to modify it.  We

11  address Tobinick's concerns about specific, substantive statements made by Dr.

12  Andersson below.

13      Tobinick also argues that Dr. Andersson's testimony is unreliable because he has

14  a financial interest in the outcome of the Interference and therefore is biased.  (Tobinick

15  Opp. 2, Paper 300, at 4, *see also* Tobinick Motion 5, Paper 363, at 2 and 11.) Tobinick

16  relies on Dr. Andersson's cross-examination testimony that in the past he received

17  money from the sale of BioAssets to Cephalon, a real party-in-interest to Olmarker and

18  that "there is a possibility that [he] will receive additional dollars in the future based on

19  the potential approval of the product by the FDA, and sales exceeding $500 million."

20  (Deposition of Gunnar Andersson, M.D., Ph.D., 11 June 2012, p. 6, l. 17, through p. 7, l.

21  3; Tobinick Opp. 2, Paper 300, at 4, citing Weinberger Decl., Ex. 2097, ¶¶ 262-66.)  We

22  note, that Olmarker similarly alleges that Tobinick's witness, Dr. Alan Weinberger, M.D.,

23  has a financial interest in the outcome of the Interference because he has a royalty-free

1   license to practice Dr. Tobinick's patented methods.  (*See* Olmarker Reply 2, Paper

2   343, at 10, citing Deposition of Alan Walter Weinberger, M.D.,  20 September 2012, Ex.

3   1134, p. 10, l. 17, through p. 11, l. 17.)  Because we review both witnesses' testimony in

4   light of the support they provide for their opinions in the patent specifications at issue

5   and the medical and scientific literature, we do not disqualify either Dr. Andersson or Dr.

6   Weinberger solely on the basis of a possible financial interest in the outcome of the

7   Interference.

8       We note that Tobinick has also raised concerns about the conduct of Dr.

9   Andersson.  (*See* Orders – Inequitable Conduct, Papers 369, 371.001, and 612;

10  Tobinick Statement pursuant to the Order – Inequitable Conduct (Paper 369), Paper

11  370.)   We discuss these issues below, following our analysis of Olmarker Motion 2.

12      Tobinick relies on the testimony of Dr. Alan Weinberger, M.D., to support the

13  arguments it makes in against Olmarker's Motion 2.  (Tobinick First Declaration of Alan

14  Weinberger, M.D. ("Weinberger Decl."), Ex. 2097.)  Dr. Weinberger testifies that he is a

15  board-certified rheumatologist in private medical practice involving the evaluation and

16  treatment of patients with rheumatologic and other medical disorders, including non-

17  surgical treatment of back and neck pain.  (Weinberger Decl., Ex. 2097, ¶¶ 4-5.)  Dr.

18  Weinberger testifies that he has expertise in and routinely uses biologic TNF inhibitors,

19  including for the treatment of back and neck pain.  (Weinberger Decl., Ex. 2097, ¶ 6.)

20  Dr. Weinberger's curriculum vitae indicates that he holds the academic positions of

21  Associate Clinical Professor of Medicine at the Center for Health Sciences, University of

22  California, Los Angeles and is an Attending Physician in the Rheumatology Clinic and

23  Service at Cedars-Sinai Medical Center, but does not indicate that he has conducted

-10-

1    any research or published any information relating to the subject matter of this

2    Interference.  (Alan Weinberger, M.D., Curriculum Vitae, Ex. 2098.)

3        Dr. Weinberger is qualified to testify on the subject matter of this Interference.

4        Tobinick also relies on the testimony of Dr. M. L. Richardson, III, M.D., to support

5    its arguments.  (Deposition of Marion L. Richardson, III, M.D., 25 June 2012

6    ("Richardson Deposition"), Ex. 2105.)  Dr. Richardson testifies that he is a board-

7    certified anesthesiologist with a sub-specialty in pain management and has been in

8    private practice since 1987.  (First Declaration of Mel Richardson, M.D., ("Richardson

9    Decl.") Ex. 2003, ¶ 1; *see also* Curriculum Vitae of M. L. Richardson, III, M.D., Ex.

10   2034.)  Dr. Richardson testifies that he has been actively involved in the treatment of

11   spinal pain syndromes for more than two decades and is a Diplomat of both the

12   American Board of Anesthesiology and the American Academy of Pain Management.

13   (*Id.*)  Dr. Richardson testifies that he was previously the Medical Director and Chief of

14   Staff at the Indian River Memorial Hospital Ambulatory Surgery Center and Chief of the

15   Department of Anesthesia at USAF Eglin Regional Hospital in Florida.  (*Id.*)  Dr.

16   Richardson does not indicate that he has conducted any research or published any

17   information relating to the subject matter of this Interference.  (*Id.*)

18       Dr. Richardson is qualified to testify on the subject matter of this Interference.

19

1    <u>Findings of Fact</u>

2         The following findings of fact, as well as others relied upon in the discussion

3    above and below, are supported by a preponderance of evidence in the record.

4         1.    Tobinick copied the involved claims from Olmarker patents 7,708,995 ("the

5    '995 patent") and 7,811,990 ("the '990 patent").  (Tobinick Application 12/714,205,

6    Amendment filed 27 June 2011, Ex. 1081, at 5.)

7         2.    The Olmarker '995 patent uses the term "locally" to describe experiments

8    on the involvement of TNF-α in nucleus pulposus-induced effects, in which

9         [t]o assess if TNF-alpha may be involved in the nucleus pulposus induced
10        nerve root injury, the presence of TNF-alpha in nucleus pulposus-cells was
11        assessed and was studied if the nucleus pulposus-induced effects could be
12        blocked by doxycycline, a soluble TNF-receptor, and a selective monoclonal
13        TNF-alpha antibody, the latter administered both locally in the nucleus
14        pulposus and systemically.
15
16    (Olmarker '995 patent, Ex. 1046, 19:12-18; Olmarker Motion 2, Paper 162, at 9, MF 47;

17    Olmarker Reply 2, Paper 343, at 2.)

18        3.    The Olmarker '995 patent provides details of experiments in which "[f]our

19    pigs received 100 mg of doxycycline intravenously, 8 pigs had a blocking monoclonal

20    antibody to TNF-alpha applied locally in the nucleus pulposus, and 4 pigs remained

21    non-treated (controls)." (Olmarker '995 patent, Ex. 1046, 17:44-47; Olmarker Reply 2,

22    Paper 343, at 2.)

23        4.    The Olmarker '995 patent provides for administration of anti-TNF-α

24    antibody, wherein "the nucleus pulposus was mixed with 100 ul of a 1.11 mg/mL

25    suspension of the anti-TNF-alpha antibody used in series 1, before application."

-12-

A12

1    (Olmarker '995 patent, Ex. 1046, at 20:27-29; Olmarker Motion 2, Paper 162, at 9, MF

2    48.)

3        5.    The Olmarker '995 patent contrasts local administration with systemic

4    administration as follows:

5            Two recently developed drugs for specific TNF-alpha inhibition were also
6            included in the study. Infliximab is a chimeric monoclonal antibody
7            composed of human constant and murine variable regions. Infliximab
8            binds specifically to human TNF-alpha. As opposed to the monoclonal
9            antibody used in series-2 for the 3-day observation period, infliximab was
10           not administered locally in the autotransplanted nucleus pulposus, but
11           instead was administered systemically in a clinically recommended dose
12           (4 mg/kg).
13
14   (Olmarker '995 patent, Ex. 1046, 27:12-20; Olmarker Motion 2, Paper 162, at 9, MF 49.)

15       6.    Dorland's Illustrated Medical Dictionary defines "local" as "[r]estricted to or

16   pertaining to one spot or part; not general."  (Dorland's Illustrated Medical Dictionary,

17   772 (23rd Ed., 1957) ("Dorland's Dictionary") at 772, Ex. 1063; Olmarker Motion 2,

18   Paper 162, at 8.)

19       7.    Dorland's Illustrated Medical Dictionary defines "general" as "[a]ffecting

20   many parts or all parts of the organism, not local."  (Dorland's Dictionary, at 552, Ex.

21   1064; Olmarker Motion 2, Paper 162, at 8.)

22       8.    Dorland's Illustrated Medical Dictionary defines "systemic" as "pertaining

23   to or affecting the body as a whole."  (Dorland's Dictionary, at 1357, Ex. 1065; Olmarker

24   Motion 2, Paper 162, at 8.)

25       9.    Stedman's Medical Dictionary defines "local" as "[h]aving reference or

26   confined to a limited part; not general or systemic."  (Stedman's Medical Dictionary for

-13-

1  the Health Professions and Nursing (7th Ed. 2012) ("Stedman's Dictionary"), at 982, Ex.

2  2082; Tobinick Opp. 2, Paper 300, at 18.)

3       10.    Olmarker's witness, Dr. Andersson, testifies that based on dictionary

4  definitions "local" administration means administration directly to the site where the

5  medicine is intended to act, while "systemic" or "general" administration is administration

6  in which the medicine is broadly distributed before reaching the site of action, such as

7  being carried to the site of action by the vascular system.  (Andersson Decl., Ex. 1060,

8  § VI, ¶ 21, p. 57.)

9       11.    Dr. Andersson testifies that "locally" in the specification of Olmarker's '995

10  patent is consistent with the dictionary definition of the term "locally" because it is

11  exemplified in Olmarker's specification by applying anti-TNF-α antibodies to the affected

12  nerve roots in the nucleus pulposus and by contrasting it with "systemic" administration.

13  (Andersson Decl., Ex. 1060, § VI, ¶ 22, p. 57.)

14       12.    The specification of the Tobinick '205 application provides that

15            Perispinal administration is a novel new concept for a delivery method for
16            cytokine antagonists for treating neurological or neuropsychiatric
17            diseases.
18
19  (Tobinick '205 application, Ex. 1008, at 8:7-8.)

20       13.    The specification of the Tobinick '205 application provides that

21            [f]or the purposes of this discussion, "perispinal" means in the anatomic
22            vicinity of the spine. For this discussion "anatomic vicinity" is generally
23            defined as within 10 centimeters, or functionally defined as in close
24            enough anatomic proximity to allow the therapeutic molecules of
25            consideration herein to reach the spine and/or the subarachnoid space
26            surrounding the spinal cord in therapeutic concentration when
27            administered directly to this area.
28
29  (Tobinick '205 application, Ex. 1008, at 8:10-14; Olmarker Motion 2, Paper 162, at 9.)

-14-

1         14.     The specification of the Tobinick '205 application provides:

2                   Perispinal administration includes, but is not limited to the subcutaneous,
3                   intramuscular, interspinous, epidural, peridural, parenteral, or intrathecal
4                   routes, and may be perilesional or alternatively, particularly when treating
5                   diseases of the brain, remote from the ultimate site of pathology.
6
7 (Tobinick '205 application, Ex. 1008, at 2:8-11; Olmarker Motion 2, Paper 162, at 10.)

8         15.     The specification of the Tobinick '205 application provides that
9
10                  [a]natomically localized administration involving perispinal use includes,
11                  but is not limited to the subcutaneous, intramuscular, interspinous,
12                  epidural, peridural, parenteral or intrathecal routes.
13
14 (Tobinick '205 application, Ex. 1008, at 8:3-5; Olmarker Motion 2, Paper 162, at 9.)

15         16.     The specification of the Tobinick '205 application provides that

16                  [a]n example of one preferred embodiment for treatment of lumbar
17                  radiculopathy due to disc herniation at the L 3-4 interspace is the
18                  perispinal administration of etanercept 25mg by injecting through the skin
19                  of the back, between the L3 and L4 spinous processes, to deliver
20                  etanercept in anatomic proximity to the site of disc herniation.
21
22 (Tobinick '205 application, Ex. 1008, at 11:21-24; Olmarker Motion 2, Paper 162, at 9.)

23         17.     The specification of the Tobinick '205 application provides:

24                  Direct injection of these specific cytokine antagonists into the CSF
25                  (intrathecal administration) is also a form of localized anatomic
26                  administration and can be accomplished by the perispinal route.
27
28 (Tobinick '205 application, Ex. 1008, at 8:19-21 Tobinick Opp. 2, Paper 300, at 12.)

29         18.     The specification of the Tobinick '205 application provides:

30                  Epidural administration, for the purposes of this patent, is also a form of
31                  perispinal administration, and, in certain clinical circumstances may be the
32                  delivery method of choice, despite its greater difficulty and greater risk.
33
34 (Tobinick '205 application, Ex. 1008, at 9:3-6; Tobinick Opp. 2, Paper 300, at 12.)

35         19.     The specification of the Tobinick '205 application provides:

-15-

A15

1        In another preferred embodiment injection of the therapeutic molecule to
2        the anatomic area adjacent to the disc herniation is accomplished by
3        epidural injection.
4

5 (Tobinick '205 application, Ex. 1008, at 12:3-4; Olmarker Motion 2, Paper 162, at 10;

6 Tobinick Opp. 2, Paper 300, at 12.)

7     20.    Olmarker's witness, Dr. Andersson, testifies that Tobinick's definition

8 effectively removes any functional distinction between local and systemic

9 administration.  (Andersson Decl., Ex. 1060, §VI, ¶ 29, pp. 60-61.)

10     21.    Tobinick's witness, Dr. Richardson, testified that "transpinal

11 administration" is a "subcutaneous type injection where the medication is delivered via

12 the venous system called Batson's plexus."  (Tobinick Opp. 2, Paper 300, at 20, citing

13 Richardson Deposition, Ex. 2105, at 11:12-16.)

14     22.    Tobinick's witness, Dr. Richardson, testified that in his clinical experience,

15 injection of steroid in the caudal region, that is at the bottom of the spine, is useful for

16 treating a disc herniation at a disc that may be four to six inches away at L3-4.

17 (Richardson Deposition, Ex. 2105, 48:3-17.)

18

19    <u>Discussion</u>

20     To determine if the Tobinick '205 specification provides sufficient support for

21 Tobinick's copied claims, we first construe the claim terms, focusing on "administered

22 locally."  As the parties agree, "when a party challenges written description support for

23 an interference count or the copied claim in an interference, the originating disclosure

24 provides the meaning of the pertinent claim language."  *Agilent Tech., Inc. v. Affymetrix,*

25 *Inc*, 567 F.3d 1366, 1375 (Fed. Cir. 2009).  (*See* Olmarker Reply 2, Paper 343, at 2;

-16-

A16

1    Amendment in Tobinick application 12/714,205, filed 27 June 2011, at 6-8.)  Tobinick

2    copied claims from Olmarker '995 and '990 patents (FF[2] 1; Tobinick Application

3    12/714,205, Amendment filed 27 June 2011, Ex. 1081, at 5.)  Thus, we look to

4    Olmarker's specification to construe the claim terms.  We focus on the specification of

5    the '995 patent, noting that Tobinick does not raise, and we do not find, conflicting

6    disclosures in the '990 patent specification.

7         As Tobinick notes, the Olmarker specification describes experiments (called

8    "series-2") in which some nucleus pulposus tissue is removed from a vertebral disc and

9    is immersed in a solution containing anti-TNF-α antibodies.  The mixture is then applied

10   to surgically exposed, but otherwise healthy, nerve roots.  (Tobinick Opp. 2, Paper 300,

11   at 17; see Olmarker '995 spec., Ex. 1046, at 17:41-48.)  Thus, the Olmarker

12   specifications describe experiments in which antibody is administered directly to the

13   nucleus pulposus tissue and the nerve root.

14        The Olmarker specification uses the term "locally" to describe these experiments.

15   (FFs 2-4; Olmarker '995 specification, Ex. 1046, at 19:12-18, 17:44-47, and 20:27-29.)

16   This local administration is contrasted with "systemic" administration, such as

17   intravenous, in other experiments (called "series-3").  (FF 5; Olmarker '995 specification,

18   Ex. 1046, at 27:12-20; Olmarker Motion 2, Paper 162, at 9, and Olmarker Reply 2,

19   Paper 343, at 2.)

20        Tobinick argues that because these references to local administration are not

21   directed to therapeutic methods they do not limit the claim scope.  (Tobinick Opp. 2,

22   Paper 300, at 17.)  We are not persuaded that even if the methods used in the

_____

[2] "FF" indicates Finding of Fact.

-17-

A17

1  experiments provided in the Olmarker specification are inappropriate for therapy, the

2  discussion is not at least somewhat useful for construing the claim terms.  Tobinick's

3  argument is not that Olmarker's specifications do not support therapeutic methods in

4  general, only that the experimental conditions are not relevant to the claimed

5  therapeutic methods.  If, though, the experiments demonstrate some of the

6  characteristics of the claimed methods they are relevant.  Because the experiments

7  described in the '995 specification use anti-TNF-α antibody to investigate effects on the

8  nucleus pulposus and nerves these experiments are relevant to the claimed methods of

9  treatment and we do not ignore the use of the term "locally" in Olmarker's specification.

10  Olmarker also cites to a medical dictionary definition of the term "local" as

11  meaning "restricted or pertaining to one spot or part; not general" to construe the claims.

12   (Olmarker Motion 2, Paper 162, at 8; FF 6.)  According to Dr. Andersson, this definition

13  is consistent with the usage of "local" in the Olmarker specification because the

14  antibodies are applied to the nerve roots in the nucleus pulposus.  (Olmarker Motion 2,

15  Paper 162, at 9; FFs 10 and 11; Andersson Decl., Ex. 1060, § VI, ¶¶ 21 and 22, p. 57.)

16

17  Tobinick relies on a different medical dictionary to define "local," arguing that the

18  dictionary used by Olmarker is 50 years old.  (Tobinick Opp. 2, Paper 300, at 17-18.)

19  The dictionary definition Tobinick relies on is not very different from the dictionary

20  definition on which Olmarker relies.  Instead of reciting "one spot," Tobinick's dictionary

21  definition recites "confined to a limited part" and both definitions contrast "local" with

22  "general" or "systemic."  (Compare FF6, Dorland's Dictionary at 772, Ex. 1063, with

23  FF9, Stedman's Dictionary, at 982, Ex. 2082; *see also* FF 7, Dorland's Dictionary, at

-18-

1   552, Ex. 1064, defining "local", and FF 8, Dorland's Dictionary, at 1357, Ex. 1065,

2   defining "systemic.")  Tobinick's dictionary definition is not in conflict with the dictionary

3   definition put forth by Olmarker and we are not persuaded that it conflicts with Dr.

4   Andersson's understanding of the claim term "administered locally" as being

5   administered directly to the site where the medicine is intended to act.

6        In light of these definitions and the use of the term "local" in Olmarker's

7   specification, we construe Tobinick's claims as being directed to administering TNF-α

8   inhibitor directly to the site where it is intended to act, that is, to the location where the

9   nucleus pulposus is causing the symptoms of the nerve disorder.  The limitation

10  "administered locally" excludes systemic administration away from the site where the

11  TNF-α inhibitor is intended to act.

12       Olmarker argues that the concept of administering a drug locally, as described in

13  the Olmarker '995 patent specification, is contrary to the description of administering

14  treatments in the Tobinick '205 application.  (Olmarker Motion 2, Paper 162, at 9.)  The

15  Tobinick specification is directed to "perispinal" administration of cytokine antagonists.

16  (FF 12, Tobinick '205 application, Ex. 1008, at 8:7-8.)  "Perispinal" is defined as being in

17  the "anatomic vicinity" of the spine, which is in turn defined as being within 10

18  centimeters or close enough to allow therapeutic molecules to reach the spine or

19  subarachnoid space.  (FF 13; Tobinick '205 spec., Ex. 1008, at 8:10-14; see Olmarker

20  Motion 2, Paper 162, at 9.)  Olmarker cites to portions of Tobinick's specification that

21  define  "perispinal" administration as including subcutaneous, intramuscular,

22  interspinous, epidural, peridural, parenteral, or intrathecal routes (FFs 14-16; Tobinick

23  spec., Ex. 1008, at 2:8-11, 8:3-5, and 11:21-24), which according to Olmarker does not

-19-

A19

1   limit the route of administration at all.  (Olmarker Motion 2, paper 162, at 9-10.)

2   Olmarker relies on Dr. Andersson's testimony to argue that this definition does not

3   exclude systemic routes of administration, and, thus, does not describe local

4   administration.  (Olmarker Motion 2, Paper 162, at 9, FF 18; Andersson Decl. Ex. 1060,

5   § VI, ¶ 26-28.)

6        Tobinick opposes Olmarker's arguments by pointing to the anatomic structure

7   called the "Batson's plexus," which, according to Drs. Richardson and Weinberger,

8   allows for molecules delivered by perispinal injection to be delivered directly to the

9   central nervous system.  (Tobinick Opp. 2, Paper 300, at 19-20; FF 21, Richardson

10  Deposition, Ex. 2105, at 11:12-16, and Weinberger Decl., Ex. 2097, ¶¶ 110-123.)

11       We are not persuaded by the evidence provided by Tobinick that the '205

12  specification refers to administration through the Batson's plexus.  Even if, as Tobinick

13  appears to argue, such administration is "local," Tobinick does not direct us to use of the

14  term "Batson's plexus" in the specification of the '205 application.  None of the evidence

15  that Tobinick cites indicates that one of skill in the art would consider "perispinal"

16  administration, or any of the other modes of administration referred to in the

17  specification of the '205 application, to be through the Batson's plexus.  Dr. Weinberger

18  testifies that the Batson's plexus provides an explanation for the methods of delivery

19  provided in the '205 specification, but he does not testify that those of skill in the art

20  would have read the '205 specification and would have understood it to refer to

21  administration into the Batson's plexus.  (*See* Weinberger Decl., Ex. 2097, ¶¶ 110-123.)

22   Thus, without a specific disclosure of the Batson's plexus in the '205 specification, we

-20-

A20

1   are not persuaded that one of skill in the art would consider the specification to be

2   directed to administration to it.

3         Furthermore, even if those of skill in the art would have read the '205

4   specification to mean administration to the Batson's plexus, Tobinick has not persuaded

5   us that it would result in a drug being "administered locally," as this term is construed

6   from Olmarker's specification.  As noted in an exhibit relied upon by Dr. Weinberger, the

7   volume of the Batson's plexus can be up to 1000 mL.  (Olmarker Reply 2, Paper 343, at

8   3, citing Tobinick & Vega, "The Cerebrospinal Venous System: Anatomy, Physiology,

9   and Clinical Implications," Medscape General Medicine (2006), Ex. 2158, at 6.)

10  Tobinick has not directed us to sufficient evidence to show that administration of a

11  molecule perispinally into any portion of the Batson's plexus would result in

12  administration directly to the location where the nucleus pulposus is causing the nerve

13  disorder. (Olmarker Reply 2, Paper 343, at 3, Andersson; Fourth Declaration of Gunnar

14  Bengt Johan Andersson, M.D., Ph.D. ("Fourth Andersson Decl."), Ex. 1135, at §III, ¶ 4,

15  p. 4.)

16        In addition, Tobinick's arguments and evidence about the efficacy of perispinal

17  administration do not persuade us that Tobinick's route of administration is the same as

18  the "local" administration provided in Olmarker's specification.  (Tobinick Opp. 2, Paper

19  300, at 20-21.)  Whether or not the methods disclosed in Tobinick's '205 specification

20  and those Dr. Tobinick performs are effective does not reveal if the disclosure supports

21  treatments "administered locally" as construed from Olmarker's specification.

22        Tobinick argues that intrathecal and epidural routes of administration are

23  localized forms of administration disclosed in the specification of the '205 application.

-21-

A21

1   (Tobinick Opp. 2, Paper 300, at 12; FFs 17 and 18, Tobinick '205 application, Ex. 1008,

2   at 8:19-21 and 9:3-6.)  According to Olmarker, though, such injections are not described

3   as being administered directly to the site where the medicine is intended to act.  For

4   example, epidural administration is described as being administered "to the anatomic

5   area adjacent to the disc herniation" (FF 19, Tobinick '205 application, Ex. 1008, at

6   12:3-4), instead of to the site of disc herniation.  (Olmarker Motion 2, Paper 162, at 10-

7   11.)  Olmarker relies on Dr. Andersson's testimony to argue that when administration is

8   at an anatomic area adjacent to the site of disc herniation, any functional distinction

9   between local and systemic administration is removed.  (*Id.*, FF 20, Andersson Decl.,

10  Ex. 1060, §VI, ¶ 29, pp. 60-61.)

11       Tobinick opposes Olmarker's argument by arguing that Dr. Andersson's

12  testimony about the efficacy of intrathecal injection is wrong.  (Tobinick Opp. 2, Paper

13  300, at 21.)  Tobinick also cites Dr. Richardson's testimony to assert that caudal

14  epidural injections (near the base of the spine) of steroids can allow the drug to diffuse

15  upwards through the epidural space to the site of disc herniation and that this is

16  considered to be a form of local administration.  (Tobinick Opp. 2, Paper 300, at 23,

17  citing Richardson Deposition, Ex. 2105, at 48:3-17, FF 22.)  Dr. Richardson's testimony

18  does not indicate that such caudal epidural administration is local or at the site where it

19  is intended to act.  Dr. Richardson does not refer to local administration, but only to the

20  efficacy of injecting steroids caudally.  In fact, Dr. Richardson contrasts such caudal

21  injections with those that are administered at the site of disc herniation.  (Richardson

22  Deposition, Ex. 2105, at 48:8-17: "And that's been my clinical experience many times

23  over thousands and thousands of patients where a caudal injection, which is way down

A22

1    at the bottom of the spine where the epidural space starts, you inject the steroid there

2    and even though the patient has a disc at L3-4, which would probably be, I'd say, in

3    most patients, may be four to six inches away from the injection, you can still get a

4    clinical effect or pain relief from injecting it caudally *as opposed to where the disc may*

5    *be herniated.*" (emphasis added)).  We are not persuaded by the evidence that Tobinick

6    presents that the disclosures of intrathecal and epidural administration in the '205

7    specification are disclosures of molecules "administered locally" as construed from the

8    Olmarker specification.

9          The balance of the evidence on this record persuades us that the specification of

10    the Tobinick '205 application does not describe a method of treatment wherein anti-

11    TNF-α antibody is "administered locally" to treat or alleviate symptoms of a nerve

12    disorder mediated by nucleus pulposus.  Olmarker has shown that the specification of

13    the '205 application is directed to administering TNF inhibitor near or adjacent to a

14    nerve disorder, but not directly to the site where the medicine is intended to act**.**

15    Because we are constrained under *Agilent* to use the Olmarker '995 patent specification

16    to construe Tobinick's claims, we cannot find, based on this record, that the

17    specification of the '205 application provides written description for the methods claimed

18    by Tobinick.

19          Because the lack of sufficient written description in junior party Tobinick's

20    application is a threshold issue, we do not reach the issue of whether the '205

21    application enables the methods claimed.

-23-

A23

1        **V.        Additional Matters**

2        In addition to the arguments discussed above, Tobinick requests that Dr.

3    Andersson's testimony be excluded in Motion 5 to exclude evidence. (Paper 363.)  In

4    general, Tobinick argues that the First Andersson Declaration should be excluded

5    entirely because "[e]ssentially all of the evidence supporting Olmarker's assertion that

6    Tobinick's disclosures would have been and still are unbelievable to one of ordinary skill

7    in the art are based on biased and unreliable testimony by Dr. Andersson."  (Tobinick

8    Motion 5, Paper 363, at 2.)  As explained above, we do not rely on Dr. Andersson's

9    testimony about the effectiveness or belief of effectiveness of Tobinick's disclosures to

10    reach our decision that Tobinick's involved claims are not supported by the specification

11    of the '205 application.  We do not exclude Dr. Andersson's testimony on these

12    grounds, as Tobinick requests.

13        Tobinick also points to specific testimony by Dr. Andersson, which it considers to

14    be factually incorrect and irrelevant.  Tobinick cites to Dr. Andersson's interpretation of

15    the term "epidural," which Olmarker relied on in its Motion 2.  (Tobinick Motion 5, paper

16    363, at 7.)  As Tobinick notes, Olmarker relies on Dr. Andersson's testimony to support

17    its Material Fact 70, which states: "The '205 Application does not limit the location of

18    epidural administration to the site of the herniation in reciting 'injection of the therapeutic

19    molecule to the anatomic area adjacent to [a] disc herniation . . . by epidural injection.'

20    Ex. 1060, pp. 60-61, § VI ¶ 29."  (Olmarker Motion 2, Paper 162, at MF 70.)  Tobinick

21    cites to Dr. Weinberger's Declaration, apparently in support of its argument.  (Tobinick

22    Motion 5, Paper 363, at 7, citing Weinberger Decl., Ex. 2097, at ¶ 104.)  Dr.

23    Weinberger's testimony provides:

-24-

1       Both the spinal nerve roots and the spinal cord are located in the
2       intrathecal (subarachnoid) space. This is because both the spinal nerve
3       roots and the spinal cord are contained within the thecal membranes. The
4       thecal membranes consist of the dura (dura mater) and the arachnoid
5       membranes. Both the spinal nerve roots and the spinal cord are
6       surrounded by the cerebrospinal fluid.
7

8   (Weinberger Decl., Ex. 2097, ¶ 104.)  Dr. Weinberger's testimony also cites to a

9   publication authored by Dr. Olmarker and provides a diagram of the major neural

10  structures in the intrathecal space.  Tobinick does not provide other explanation of why

11  Dr. Andersson's testimony is factually incorrect and irrelevant.

12       It is not apparent to us how this testimony of Dr. Andersson is in conflict with Dr.

13  Weinberger's testimony.  The statement that Tobinick objects to does not discuss

14  epidural administration in general, but only epidural administration as provided in the

15  '205 application.  Dr. Weinberger's testimony, though, refers only to the anatomy of the

16  spinal nerve roots and spinal cord in the intrathecal space.  Tobinick has not provided

17  sufficient explanation of how Dr. Weinberger's testimony demonstrates that Dr.

18  Andersson's testimony is factually incorrect or irrelevant.

19       We note that the testimony of Dr. Andersson cited by Tobinick also states that

20  "Tobinick's description of localized administration is poorly conceived and would not

21  guarantee that any medicine will reach the site of a disorder." (Andersson, Decl., Ex.

22  1060, pp. 60-61, § VI ¶ 29.)  We do not rely on this statement in our opinion and do not

23  offer any opinion of it.

24       Tobinick also cites to the Fourth Andersson Declaration and Olmarker's reliance

25  on it in Tobinick's motion to exclude evidence.  (Tobinick Motion 5, paper 363, at 12-13.)

26   Tobinick does not provide specific arguments against particular statements made by

-25-

A25

1   Dr. Andersson in his fourth declaration.  Instead, Tobinick argues that "the scientific

2   errors made by Dr. Andersson were so numerous, and so significant, that his scientific

3   testimony is entirely unreliable," citing to almost 70 paragraphs of testimony by Dr.

4   Weinberger.  (Tobinick Motion 5, Paper 363, at 13.)  Review of this testimony by Dr.

5   Weinberger does not persuade us that the testimony in Dr. Andersson's fourth

6   declaration we relied on regarding local administration and the Batson's plexus was

7   incorrect.  (See Andersson Fourth Declaration, Ex. 1135, at §III, ¶ 4, p. 4.)  Tobinick has

8   not provided sufficient argument or citation in its motion to persuade us otherwise.

9   *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1250, n.2 (Fed. Cir. 2008)

10  (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like

11  pigs, hunting for truffles buried in briefs.")).

12          We do not rely on any of the other evidence that Tobinick cites to in its Motion 5,

13  and thus do not review Tobinick's arguments regarding this evidence.

14          We also note that Tobinick has raised issues of inequitable conduct in this

15  Interference and prior Interference 105,842.  (See Tobinick Statement pursuant to the

16  Order – Inequitable Conduct (Paper 369) ("Tobinick Statement"), Paper 370.)

17  Tobinick's allegations relate to whether nucleus pulposus causes central nervous

18  system disorders and the prior art status of "the Le '488 application."  (Tobinick

19  Statement, Paper 370, at 6.)  Because our opinion in this Interference does not hinge on

20  whether nucleus pulposus causes central nervous system disorders and the prior art

21  status of "the Le '488 application" was not raised in this Interference, we do not consider

22  Tobinick's allegations.  Furthermore, to the extent that Tobinick argues that that certain

23  Olmarker patent claims involved in this Interference should have been found

1  unpatentable in another interference, we decline to address these concerns in light of

2  our decision on the threshold issue of the lack of written description support for

3  Tobinick's involved claims.

4  **VI.    Conclusion**

5      We enter judgment against Tobinick '205 application claims 68, 69, and 71-80,

6  separately.

7

1    Torczon, *Administrative Patent Judge*, concurring.

2    This case underscores the peril in claim copying.

3    For more than a generation, claim copying has not been necessary to suggest an

4    interference.  *E.g.*, *Aelony v. Arni*, 547 F.2d 566, 570 (CCPA 1977) (claimed subject

5    matter need not even overlap).  Nevertheless, patent practitioners persisted in copying

6    claims.  Claim copying is a nuisance (inevitably leading to a mismatch between the

7    language of the claim and the disclosure with resulting confusion or otherwise unneeded

8    analysis), but it was essentially harmless.

9    Now claim copying is destructive to applicants and their counsel.  Without any

10   basis in a statute or any justification in interference practice, a court opinion created a

11   surprising exception in written description law for copied claims, albeit only at the United

12   States Patent and Trademark Office.  *In re Spina*, 975 F.2d 854, 856 (Fed. Cir. 1992);

13   *Agilent Techs., Inc. v. Affymetrix, Inc.*, 567 F.3d 1366 (Fed. Cir. 2009); *Koninklijke*

14   *Philips Elecs. N.V. v. Cardiac Sci. Operating Co.*, 590 F.3d 1326, 1332 (Fed. Cir. 2010);

15   *but see Cultor Corp. v. A.E. Staley Mfg. Co.*, 224 F.3d 1328, 1332 (Fed. Cir. 2000)

16   (wisely declining to extend *Spina* to the district courts).[3]

17   Whether a doctrine, not compelled by statute or logic, messy to administer and

18   catastrophic to unwary applicants and patent practitioners should persist is a question

19   only the courts can resolve.  Resolution is urgently needed.

20

---

[3] For a catalogue of some of the difficulties that *Agilent* has created, *see, e.g.*, *Lazaridis v. Eggleston*, 2011 WL 1676301 (BPAI 2011) (dubitante opinion); *Rilo v. Benedict*, 2011 WL 729494 n.55 (BPAI 2011).

-28-

A28

1    cc (via e-mail):
2
3
4    Attorney for Tobinick:
5
6           Robert W. Hahl, Esq.
7           Richard A. Neifeld, Esq.
8           NEIFELD IP LAW, PC
9           Email: rhahl@neifeld.com
10          Email: rneifeld@neifeld.com
11
12
13   Attorney for Olmarker:
14
15          Todd R. Walters, Esq.
16          Christopher L. North, Esq.
17          Erin M. Dunston, Esq.
18          BUCHANAN INGERSOLL & ROONEY PC
19          Email: todd.walters@bipc.com
20          Email: christopher.north@bipc.com
21          Email: erin.dunston@bipc.com

-29-

A29

Paper 616

Mail Stop Interference
P.O. Box 1450                                          Filed: 22 January 2013
Alexandria Va 22313-1450
Tel: 571-272-4683
Fax: 571-273-0042

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

EDWARD **TOBINICK**,
Junior Party
(Application 12/714,205),

v.

KJELL **OLMARKER** and BJÖRN RYDEVIK
Senior Party
(Patents 7,708,995, 7,811,990, 7,906,481, 8,057,792, and 6,649,589).

————————

Patent Interference No. 105,866
(Technology Center 1600)

————————

*Before* Richard Torczon, Sally Gardner Lane, and Deborah Katz, *Administrative
Patent Judges.*

Katz, *Administrative Patent Judge*.

1
2                                    **JUDGMENT**

-1-

A30

1    Further to the Decision on Motions (Paper 615), finding all of Tobinick involved

2  claims 68, 69, and 71-80 unpatentable under 35 U.S.C. § 112, first paragraph, for lack

3  of sufficient written description, it is **ORDERED** that judgment is awarded against Junior

4  Party Tobinick.

5    **FURTHER ORDERED** that claims 68, 69, and 71-80 of Tobinick Patent

6  Application 12/714,205 are FINALLY REFUSED. 35 U.S.C. § 135(a).

7    **FURTHER ORDERED** that attention is directed to 35 U.S.C. § 135(c) Bd. R. 205

8  regarding the filing of settlement agreements.

9    **FURTHER ORDERED** that a copy of this JUDGMENT shall be placed in the files

10  of (1) Tobinick Patent Application 12/714,205, (2) Olmarker Patent 7,708,995, (3)

11  Olmarker Patent 7,811,990, (4) Olmarker Patent 7,906,481, (5) Olmarker Patent

12  8,057,792, and (6) Olmarker Patent 6,649,589.

13

cc (via e-mail):

Attorney for Tobinick:

      Robert W. Hahl, Esq.
      Richard A. Neifeld, Esq.
      NEIFELD IP LAW, PC
      Email: rhahl@neifeld.com
      Email: rneifeld@neifeld.com

Attorney for Olmarker:

      Todd R. Walters, Esq.
      Christopher L. North, Esq.
      Erin M. Dunston, Esq.
      BUCHANAN INGERSOLL & ROONEY PC
      Email: todd.walters@bipc.com
      Email: christopher.north@bipc.com
      Email: erin.dunston@bipc.com

A32

Mail Stop Interference                                                    Paper 618
P.O. Box 1450                                                    Filed: 1 April 2013
Alexandria Va 22313-1450
Tel: 571-272-4683
Fax: 571-273-0042

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

EDWARD **TOBINICK**,
Junior Party
(Application 12/714,205),

v.

KJELL **OLMARKER** and BJÖRN RYDEVIK
Senior Party
(Patents 7,708,995, 7,811,990, 7,906,481, 8,057,792, and 6,649,589).

————————

Patent Interference No. 105,866
(Technology Center 1600)

————————

1          **Decision on Tobinick Request for Rehearing**

2          *Before* Richard Torczon, Sally Gardner Lane, and Deborah Katz, *Administrative*

3    *Patent Judges*.

4          Katz, *Administrative Patent Judge*.

5          Tobinick requests rehearing of our Decision on Motions (Paper 615, "Decision"),

6    specifically of our decision to grant Olmarker Motion 2, to deny authorization to file a

7    motion alleging inequitable conduct, and to not consider Tobinick Motions 1-5.

1   (Tobinick Request for Rehearing of Motions, Paper 617 ("Request"), at 2.)  Tobinick

2   bears the burden of showing that our decisions should be modified and must identify

3   matters that it believes were misapprehended or overlooked.  Bd.R. 125(c)(3).

4        Tobinick argues that we too narrowly construed the term "wherein the antibody is

5   administered locally," which appears in the Count and Tobinick claim 68, and the term

6   "wherein the antibody is administered epidurally," which appears in Tobinick claim 69.

7   (Request 3-5.)  According to Tobinick, we based the construction of the term

8   "administered locally" solely on the "Series-2" experiment described in Olmarker's

9   specification.  (*Id.* at 4.)  According to Tobinick, we overlooked "the evidence cited in

10   Tobinick's Motions 1, 2, 3 and 4, which shows by a preponderance of the evidence that

11   the experimental failure of Series-2 indicates that Olmarker never described the subject

12   matter of the claims."  (*Id.* at 5.)  Tobinick does not point to evidence presented in its

13   Opposition 2 that we overlooked.  Thus, Tobinick has not given us a basis on which to

14   review our decision.  *See In re Cygnus Telecommc'ns Tech., LLC, Patent Litig.*, 536

15   F.3d 1343, 1352-3 (Fed. Cir. 2008) (refusing to consider parts of the record not

16   presented in connection with a motion, even if the evidence could be found somewhere

17   in the materials that are part of the record on appeal).  Tobinick did not raise the issue

18   of a failure of Series-2 in its Opposition 2.  The only argument that Tobinick made

19   against reliance on the description of the Series-2 experiment in claim construction was

20   that the description is of an experimental study, not of a therapeutic method.  (Tobinick

21   Opp. 2, Paper 300, at 17, ll. 4-20.)  We considered this argument in our Decision and

22   found it to be unpersuasive because the experiments demonstrate at least some of the

23   characteristics of the claimed methods.  (Decision, Paper 615, at 17, l. 20, through p.

2

A34

1    18, l. 9.)

2        Tobinick argues in its Request that its description of epidural administration

3    "adjacent to the disk herniation" necessarily puts the drug where the medicine is

4    intended to act and, thus, supports Tobinick's claims.  (Request at 4-5.)  We considered

5    this argument and did not find it persuasive because epidural administration is

6    described in the Tobinick '205 application as being to the "anatomic area adjacent to the

7    disc herniation" (Tobinick '205 application, Ex. 1008, at 12:3-4), instead of to the site of

8    disc herniation.  (Decision at 22.)  As explained by Tobinick's witness, Dr. Richardson,

9    injecting into the epidural space is not the same as injecting into the specific site where

10   a disc is herniated.  (Decision at 22-23, citing Richardson Deposition, Ex. 2105, at 48:3-

11   17.)  On request for rehearing, Tobinick has not directed us to evidence that we

12   overlooked or misapprehended in regard to this argument.

13       In its Request, Tobinick states that its Motions 1-5 should have been decided, but

14   does not provide any other argument in support.  Tobinick does not argue that we erred

15   in determining that Olmarker Motion 2 presented a threshold issue (*see* Decision, Paper

16   615, at 6) or that Tobinick Motion 1 does not present a threshold issue (*see id.* at 6-7).

17   Thus, we are not persuaded that we misapprehended or overlooked anything in

18   declining to decide Tobinick Motions 1-5.  *See Berman v. Housey,* 291 F.3d 1345, 1352

19   (Fed. Cir. 2002).

20       Tobinick also argues that we misapprehended the significance of the testimony

21   Tobinick cites in its request to file a motion for inequitable conduct.  (Request 5-6; *see*

22   Tobinick Statement pursuant to the Order – Inequitable Conduct, Paper 370

23   ("Statement").)  Specifically, Tobinick argues that our decision depends on whether the

1   nucleus pulposus causes central nervous system disorders and that we overlooked that

2   fact in denying Tobinick an opportunity to file a motion asserting inequitable conduct.

3   Tobinick argues that the meaning of "administered locally" necessarily depends on

4   where the disorder occurs and that because the disorder occurs at the spinal cord, the

5   location where medicine is intended to act is the central nervous system.  (Request at 5-

6   6.)

7        We are not persuaded that we abused our discretion by declining Tobinick's

8   request for consideration of inequitable conduct.  Tobinick's premise is flawed because

9   our decision was not based on the portions of Dr. Andersson's declarations that

10  Tobinick alleges were falsely made.  Specifically, Tobinick alleged that the following

11  statements were false:

12       Andersson Declaration, Ex. 1060, § X, ¶ 11, p. 85: "The intrathecal route is only
13       proposed in the '388 Application for acute spinal cord injury, and disorders of the
14       central nervous system, not any disorder mediated by nucleus pulposus."
15
16       Third Andersson Declaration, Ex. 1095, § IV, ¶ 16, p. 41: "Herniated discs
17       generally affect the peripheral nervous system and do not cause CNS lesions."
18
19  (Statement, paper 370, at 3-4.)  In our discussion regarding intrathecal and epidural

20  administration in the Tobinick '205 application, we relied on Dr. Andersson's testimony

21  in Exhibit 1060, at §VI, ¶ 29, pp. 60-61. (*See* Request at 6, citing Decision, Paper 615,

22  at 21-22.)  That testimony refers to the description in the Tobinick '205 application of

23  administration to an area adjacent to disc herniation and whether this administration is

24  local to the site of disc herniation.  (Decision at 22.)  Because the testimony we relied

25  upon was not about the central nervous system, we are not persuaded that we

26  misapprehended or overlooked anything in declining to entertain a motion for

27  inequitable conduct.

4

A36

1       Accordingly, we do not modify our Decision.

2

3

4   cc (via e-mail):
5
6
7   Attorney for Tobinick:
8
9       Robert W. Hahl, Esq.
10      Richard A. Neifeld, Esq.
11      NEIFELD IP LAW, PC
12      Email: rhahl@neifeld.com
13      Email: rneifeld@neifeld.com
14  Attorney for Olmarker:
15
16      Todd R. Walters, Esq.
17      Christopher L. North, Esq.
18      Erin M. Dunston, Esq.
19      BUCHANAN INGERSOLL & ROONEY PC
20      Email: todd.walters@bipc.com
21      Email: christopher.north@bipc.com
22      Email: erin.dunston@bipc.com

𝕌𝕟𝕚𝕥𝕖𝕕 𝕊𝕥𝕒𝕥𝕖𝕤 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔦𝔯𝔠𝔲𝔦𝔱
*TOBINICK v OLMARKER, 2013-1499*

## CERTIFICATE OF SERVICE

I, Robyn Cocho, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by NEIFELD IP LAW, PC, Attorneys for Appellant to print this document.  I am an employee of Counsel Press.

On **September 3, 2013**, Counsel for Appellant has authorized me to electronically file the foregoing **Brief for Appellant** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Todd R. Walters
Erin M. Dunston
Buchanan Ingersoll & Rooney P.C.
Firm: 703-836-6620
1737 King Street
Alexandria, VA 22314
703-838-6556
todd.walters@bipc.com
erin.dunston@bipc.com
*Counsel for Appellees*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

September 3, 2013                                    /s/ Robyn Cocho
                                                    Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

    1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

  <u> X  </u>  The brief contains <u>7,437</u> words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),or

<u>    </u>  The brief uses a monospaced typeface and contains <u>      </u> lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

    2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

  <u> X  </u>  The brief has been prepared in a proportionally spaced typeface using <u>MS Word 2007</u> in a <u>14</u> point <u>Times New Roman</u> font or

<u>    </u>  The brief has been prepared in a monospaced typeface using <u>        </u> <u>           </u>in a <u>   </u> characters per inch<u>       </u> font.

September 3, 2013                  <u>/s/RobertHahl             </u>
                                    Neifeld IP Law, PC
                                    Counsel for Appellant